[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JAN 5, 2009
THOMAS K. KAHN
CLERK

_____

No. 07-13086

_____

D. C. Docket No. 01-01296-CV-WBH

MARCUS WELLONS,

                                                        Petitioner-Appellant,

versus

HILTON HALL, Warden,
Georgia Diagnostic and
Classification Prison,

                                                        Respondent-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(January 5, 2009)
**(As Amended 2/5/09)**

Before TJOFLAT, BLACK and WILSON, Circuit Judges.

WILSON, Circuit Judge:

Marcus Wellons, an inmate sentenced to death in Georgia for the malice murder and rape of 15-year-old India Roberts, appeals the district court's denial of his petition for a writ of habeas corpus. Wellons raises five issues from his certificate of appealability that we group and address under the following headings: (1) Judge, Juror, and Bailiff Misconduct; (2) *Sabel* Discovery Error; (3) Ineffective Assistance of Counsel; and (4) Constitutionality of Georgia's Death Penalty System. Because neither the Georgia Supreme Court nor habeas court's decisions are contrary to, or an unreasonable application of, clearly established Supreme Court law, we affirm the district court's denial of federal habeas relief.

## I. BACKGROUND

### A. *Factual Background*[1]

Throughout the summer of 1989, Wellons lived with his girlfriend, Gail Saunders, in her townhouse apartment in Cobb County. Early that summer, Saunders' 14–year–old son Tony also lived in the apartment. Tony and the victim, who lived in a neighboring apartment with her mother, were friends. The victim occasionally visited Tony inside Saunders' apartment, where the two youths would watch television or play Nintendo. Wellons encouraged Tony to date the victim, remarking several times that she was a good looking girl. At some point during the summer, Tony moved to Chattanooga to live with his grandparents. The victim continued to spend time with Saunders occasionally. Saunders described herself as the victim's "play mommy" with whom the victim shared confidences.

Wellons and Saunders had become acquainted at the hospital where both worked, Wellons as a counselor in the psychiatric ward. Wellons

---

[1] We draw the facts as summarized by the Supreme Court of Georgia' opinion affirming Wellons's conviction and sentence on direct appeal.

2

moved in with Saunders on the pretense that he owned a home but was unable to occupy it, because an ex-girlfriend had moved there with her two young daughters, and he could not in good conscience turn them out. Over the summer Wellons proposed marriage to Saunders. However, by then Saunders had become wary of Wellons, who was increasingly hostile and abusive. She verbally accepted his proposal out of fear, all the while seeking an escape from her predicament.

On the evening of August 30, 1989, Saunders told Wellons that their relationship was over and that he must move out of her apartment. Wellons, who had recently been fired from his job, purchased a one-way ticket to Miami for a flight departing on the evening of August 31. Fearing to be alone with Wellons the night before his departure, Saunders told Wellons that she was going to Chattanooga to spend the night with her parents and enroll Tony in school. Instead, Saunders went to the home of a female friend.

That evening, Wellons began making desperate attempts to reach Saunders by telephone. He called her mother in Chattanooga repeatedly, only to be told that Saunders had not arrived. Wellons then called Saunders' friends, but no one knew or revealed her whereabouts. He called his mother and told her he suspected that Saunders was with another man. Wellons became increasingly angry and began drinking. He ransacked Saunders' apartment. He overturned potted plants and furniture, threw flour onto the floor, and poured bleach over all of Saunders' clothes, carefully sparing his and Tony's belongings in the process.

After the apartment was demolished, Wellons began attempts to cover up his deed. He broke a window, from the inside out, cutting his hand in the process and smearing blood around the apartment. He stacked electronic equipment by the door. He then called 911 at approximately 3:00 a.m. on August 31 to report a burglary. When a police officer arrived, Wellons told the officer that he had come home to find the apartment ransacked, although no items were missing. Wellons explained to the officer that he cut his hand while struggling to uncover a stash of money to determine if it had been taken. Sometime after the officer left, Wellons wrote a racial slur across the wall in Saunders' bedroom.

Several hours later, at approximately 8:00 a.m., the victim said goodbye to her mother and walked from her apartment, past Saunders' door, toward the school bus stop. Shortly thereafter, Saunders' next door neighbor heard muffled screams from inside Saunders' apartment.

3

The apartment building was close to a wooded area, beyond which was a grocery store. At approximately 2:00 p.m., Wellons approached an acquaintance who was employed at the grocery store and asked to borrow a car. The acquaintance refused. Wellons told the acquaintance that when he (Wellons) returned home the previous night, he encountered two white men who were burglarizing the apartment. Wellons said that he successfully fought off the intruders but explained that he had in the process sustained the injuries to his hand.

About half an hour later, Theodore Cole, a retired military police officer, was driving near the wooded area behind the apartment complex. He spotted in the distance a person carrying what appeared to be a body wrapped in a sheet. He distinctly saw feet dangling from the bottom of the sheet. Cole drove on but then returned for a second look. He drove around in the parking lot of the apartment complex and saw nothing. As he was driving away, however, he saw a man in his rear view mirror walk along the road and throw a sheet into the woods. Cole drove directly to the grocery store, where he called 911. Police officers arrived quickly and began a search of the woods.

The police first discovered sheets, clothing and notebooks bearing Tony's name. Then, upon close inspection of a pile of tree branches near where he had seen the man carrying the sheet, Cole spotted the body of India Roberts. When the branches were removed, the officers discovered that the victim was completely unclothed, with cuts on one side of her face and ear and bruises on her neck.

During the search of the woods, Cole spotted a black man with a bundle under his arm near the apartment building and identified him as the man Cole had seen carrying the sheet. Cole and an officer chased the man, but as they approached the building, the man turned the corner and Cole and the officer heard a door shut. The officer learned from a passerby which apartment was occupied by a man fitting the description given by Cole. He knocked on Saunders' door and announced his presence, but there was no answer. He returned to join the other officers, who were investigating the scene in full force, with helicopters overhead.

Wellons, now trapped inside Saunders' apartment with residual evidence of his crime, gave up his attempt to dispose of the evidence in the woods. He first tried to clean the apartment and his clothes. He then abandoned that project, changed into swim wear, grabbed an old, yellowed newspaper and a cup of wine, partially barricaded and locked the door, and

headed for the pool.  On his way, Wellons caught sight of a police officer and stopped abruptly.  The officer began questioning him.  Initially evasive, Wellons did ultimately tell officers that the injuries to his hand, and new scratches to his face, were sustained during a scuffle with two men whom he had caught burglarizing Saunders' apartment.

While investigating the scene, officers had asked Cole whether either of two black males was the man Cole had seen carrying the sheet.  Cole immediately ruled out each of the men.  Then, while officers were questioning Wellons, one officer standing at a distance from the questioning asked Cole whether Wellons was the man he had seen.  Cole said that although Wellons was wearing different clothing from the man he had seen carrying the sheet, and whom he had again seen near the complex, Cole was 75 to 80 percent certain that Wellons was the same man.

Later that day, officers searched Saunders' apartment.  Inside, they found numerous items of evidence including the victim's notebooks and earrings.  In Tony's room, they discovered the victim's panties.  They also found blood on Tony's mattress and box springs.  The mattress had been flipped so that the bloody portion was facing downward, and the bed had been remade.

The autopsy revealed that the victim died from manual strangulation, which in itself would have taken several minutes.  The autopsy also showed that Wellons had attempted to strangle the victim with a ligature, possibly a telephone cord, and that he had bruised her and cut her face and ear with a sharp object.  The evidence suggested that Wellons had dragged or otherwise forcibly moved the victim from the kitchen up the stairs to Tony's bedroom.  Finally, the autopsy revealed a vaginal tear and copious amounts of what appeared to be seminal fluid within the victim's vagina.  She had defensive wounds to her hands, and her blouse was stained with her own blood.

*Wellons v. State*, 463 S.E.2d 868, 873–75 (Ga. 1995).

B.  *Procedural History*

1.  Trial and Sentencing Phases

Wellons was charged with the malice murder and rape of India Roberts.

Wellons did not dispute his participation in the crimes, but pleaded not guilty by reason of insanity or guilty but mentally ill. During pre-trial proceedings, the state moved for the disclosure of the identities, addresses, and written reports of any experts consulted by defense counsel, arguing that under *Sabel v. State*, 282 S.E.2d 61 (Ga. 1981), the prosecution was entitled to full discovery from these experts whether or not the defense intended to have them testify at trial. The defense argued that such disclosure would effectively chill Wellons's consultation with mental health experts and impede defense efforts to prepare for both the guilt and penalty phases of trial, in violation of Wellons's federal constitutional rights to due process and the effective assistance of counsel. Over the defense's forceful objections, the court ruled in favor of the state and ordered the defense to disclose the names, addresses, and written reports of any experts consulted.

Wellons moved for interim review, arguing that the discovery violated due process because it granted the prosecution broader discovery rights against Wellons than he had against the state. Wellons explained that the *Sabel* ruling prevented defense counsel from consulting with experts to understand the scientific matters involved with his defense, decide what further lines of investigation to pursue as necessary, discern which defenses or theories and theories were viable, and assist in the cross-examination and rebuttal of the state's medical experts. The

6

defense also argued that while Wellons needed to speak candidly with mental health experts during his examination, such unreserved disclosure to the experts may compromise Wellons's privilege against self-incrimination in light of the *Sabel* ruling.[2]  The court rejected these arguments and denied the request for interim review.

Nine days before jury selection, the defense requested the court to clarify its *Sabel* order.  The defense had consulted three experts, none of whom had yet written reports.  The defense contended that any reports that would be prepared should be exempt from the court's *Sabel* ruling because they are not "scientific" reports under *Caldwell v. State*, 393 S.E.2d 436 (Ga. 1990).[3]  The court ruled that any reports from the three experts—a psychiatrist, psychologist, and sociologist—would be scientific reports and must be disclosed to the prosecution pursuant to the *Sabel* order.  After the court denied Wellons's motion to reconsider, defense counsel disclosed the identities of the mental health experts consulted.  To

---

[2] Dr. Bary Scanlon, an expert psychiatrist consulted by the defense, submitted an ex parte affidavit in support of defense motions against the *Sabel* order explaining that he was unable to render an official opinion as to Wellons's mental state because Wellons would not discuss the facts and circumstances surrounding the crime during the interview.

[3] In holding that DNA identification evidence is admissible in a criminal trial, the Georgia Supreme Court reaffirmed that the test for the admissibility of "scientific" evidence is "'whether the procedure or technique in question has reached a scientific stage of verifiable certainty.'"  *Caldwell*, 393 S.E.2d at 441 (quoting *Harper v. State*, 292 S.E.2d 389, 395 (Ga. 1982)).

7

avoid any further disclosures, however, defense counsel refrained from having the experts prepare any written reports.

In light of the *Sabel* rulings, Wellons's counsel decided not to present any mental health expert testimony during the guilt phase of trial. On June 6, 1993, a jury convicted Wellons of malice murder and rape.

During the penalty phase, Wellons presented seventeen mitigation witnesses, including an expert sociologist and an expert psychologist. The lay witnesses—especially members of Wellons's immediate family—testified about the physical abuse Wellons suffered at the hands of his father and about Wellons's history of substance abuse. Dr. Marti Loring, the expert sociologist, wrote a report for the penalty phase and testified about the typical effects of child abuse and the impact Wellons's history of abuse may have had on him. Dr. Steven O'Hagen, the expert psychologist, testified—on the basis of Dr. Loring's written report and his own interview with Wellons—that Wellons suffers from post-traumatic stress disorder, a mixed personality disorder, and substance abuse, but does not suffer from brain damage and is not psychotic. Dr. O'Hagen acknowledged the court-appointed psychiatrist's conclusions that Wellons is an intelligent, well-educated man with a significant personality disorder but who suffers neither pyschosis nor brain damage. On cross-examination, Dr. O'Hagen admitted that at defense

8

counsel's request, he did not put his findings and conclusions in writing. The prosecution made this admission the center of its impeachment of Dr. O'Hagen's testimony, dubbing Dr. O'Hagen's conclusions "mystery findings."

On June 8, 1993, Wellons was sentenced to death for the murder of India Roberts, the jury having found as statutory aggravating circumstances that the murder was wantonly vile and horrible and involved torture and depravity of mind. Wellons received a sentence of life imprisonment for the rape conviction.

During their post-trial interviews of the jurors, defense counsel learned that either during or immediately following the penalty phase, some jury members gave the trial judge chocolate shaped as male genitalia and the bailiff chocolate shaped as female breasts. Defense counsel also learned that while the jurors were eating dinner at a local restaurant in a room separated from other diners, the judge entered their room and spoke to them. Immediately upon learning this information, Wellons's counsel moved for a new trial and to recuse the trial judge. The court denied both motions.

2. Direct Appeal and State Habeas Proceedings

Among the thirty-five claims Wellons raised on direct appeal before the Georgia Supreme Court, he argued that: (1) the trial court's *Sabel* ruling prevented him from effectively presenting his insanity defense at the guilt and penalty phases

of trial by chilling his consultation with mental health experts; (2) the trial judge should have recused because she and the bailiffs allegedly had improper communications with the jurors; (3) that Georgia's death penalty scheme violates the Equal Protection Clause because unfettered prosecutorial discretion results in its disproportionate administration; and (4) that the method of execution (at that time by electrocution) violates the Eighth Amendment as cruel and unusual punishment. Central among these was Wellons's *Sabel* claim—that the ruling rendered his trial fundamentally unfair because his counsel, faced with the Hobson's choice of granting the state full access into the defense's mental health investigation and case theory by consulting mental health experts, was compelled to forgo the expert testimony needed to support Wellons's defense.

The Georgia Supreme Court concluded that Wellons's judicial disqualification and death penalty arguments lacked merit. *Wellons*, 463 S.E.2d at 880–82. On the first claim, however, the court acknowledged that under *Rower v. State*, 443 S.E.2d 839 (Ga. 1994), the trial court's *Sabel* ruling was erroneous. *Wellons*, 463 S.E.2d at 875–76. In *Rower*, decided after Wellons's trial but during his direct appeals, the Georgia Supreme Court overruled *Sabel*, holding that the state is entitled to receive only those scientific reports that the defense intends to use at trial, and not—as *Sabel* required—the reports of any experts consulted by

10

the defense in preparation for trial. *Rower*, 443 S.E.2d at 841–42. In so holding, the court reasoned that *Sabel*'s disclosure mandate did not provide reciprocal discovery rights, but rather granted the state greater discovery rights than the statutory discovery rights provided the defendant. *Id.* at 842. Because the discovery system under *Sabel* did not ensure "'a balance of forces between the accused and his accuser,'" the Georgia Supreme Court overruled *Sabel* as a violation of a criminal defendant's right to due process. *Id.* (quoting *Wardius v. Oregon*, 412 U.S. 470, 474, 93 S. Ct. 2208, 2212, 37 L. Ed. 2d 82 (1973)).

Although the Georgia Supreme Court found that the *Sabel* ruling was erroneous, *Wellons*, 463 S.E.2d at 876, it concluded that the error was harmless because Wellons did not disclose any expert reports. *Id.* The court found no prejudice from counsel's decision not to present any mental health expert testimony during the guilt phase because "the evidence as a whole demonstrate[d] that his defenses of insanity and mental illness were simply not viable." *Id.* The Georgia Supreme Court also determined that the *Sabel* ruling did not prejudice Wellons during the penalty phase because he presented seventeen mitigation witnesses, including a sociologist and psychologist, who testified to Wellons's abusive family history and psychological state. *Id.* Ultimately, the Georgia Supreme Court was not persuaded by the "chilling effect" that Wellons argued

11

denied him due process or the effective assistance of counsel. In affirming

Wellons's conviction and sentence, the court observed that

> the error, though it might well have initially had a chilling effect on consultation with experts, was ultimately harmless. The chilling effect could have been and apparently was cured after Wellons decided to raise the insanity defense. His counsel made an intelligent, strategic choice not to contest Wellons' participation in the crimes, to merely introduce the idea of mental illness in the guilt-innocence phase of trial, and then to bring every effort to bear in mitigation.

*Id.* at 876–77. The United States Supreme Court denied Wellons's petition for writ of certiorari. *Wellons v. Georgia*, 519 U.S. 830, 117 S. Ct. 97, 136 L. Ed. 2d 52 (1996).

Wellons subsequently petitioned the Superior Court of Butts County for state habeas relief. He attacked his conviction and sentence on the grounds that, among other things, the *Sabel* ruling created a structural defect depriving him of due process (Ground One) and denied him the effective assistance of trial counsel (Ground Six). Wellons also argued that certain incidents of judge, juror, and bailiff misconduct denied him a fair and impartial trial (Grounds Two–Four); that his trial and appellate counsel were constitutionally ineffective in the overall manner in which they investigated and advocated his case (Ground Seven); and that the Georgia death penalty procedure is unconstitutional both facially and as applied to him (Ground Sixteen).

12

The state habeas court conducted an evidentiary hearing, noting at the outset that the due process and ineffectiveness claims related to the *Sabel* ruling would be central to its analysis. The court further limited the scope of the hearing by denying Wellons's request to present evidence on his claims of judge, juror, and bailiff misconduct. It determined that those claims were precluded from state habeas review because the Georgia Supreme Court's decision on direct appeal rendered them "res judicata."

At the hearing, Derek Jones, Wellons's lead counsel during the trial and direct appeals, testified that he believed the *Sabel* rulings placed him in a position where he was unable to fully and adequately advocate Wellons's mental heath defenses in both the guilt and penalty phases of trial. He explained that based on his experience trying capital cases such as Wellons's, where the defenses of insanity and mental illness have been pled, counsel's consultation with mental health experts is critical to the defense, irrespective of whether the experts eventually testify. According to Jones, these experts could have helped him decide what defenses and lines of investigation to pursue and whether the chosen defenses were viable. Because the *Sabel* ruling would have required full disclosure of this information to the state, however, Jones explained that he felt compelled to forgo the full psychological and psychiatric consultation he would have otherwise

13

pursued to best defend his client's case.

In its final order, the Superior Court of Butts County determined that nearly all of Wellons's claims were barred from habeas review, either because they were res judicata or procedurally defaulted. The only claim to survive both procedural bars was Wellons's claim that the *Sabel* ruling rendered his trial and appellate counsel ineffective. Reviewing that claim under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the state habeas court found that Jones ardently contested the *Sabel* ruling, yet when it became clear that the ruling would be the law of the case, Jones was "forced to make a determination as to whether to use experts and risk providing key evidence for the State that it would not have otherwise had, or to not use experts at all." Res. Exh. 64 at 26. Under these circumstances, Jones's decision to present no mental health expert evidence during the guilt innocence phase was not deficient, but rather an informed, tactical decision.

The state habeas court also found that despite the *Sabel* ruling, defense counsel was able to have Dr. O'Hagen conduct psychological tests and officially diagnose Wellons in preparation to testify at the penalty phase. In all, trial counsel's performance was consistent with the actions of a reasonable attorney under similar circumstances. Finding no deficiency in trial counsel's performance,

14

the court concluded that Wellons was not entitled to habeas relief.[4]  On January 9, 2001, the Georgia Supreme Court denied Wellons's application for a certificate of probable cause to appeal; it denied his motion for reconsideration on April 13, 2001.

3.  Federal Habeas Proceedings

Wellons filed his first petition for writ of federal habeas corpus on May 18, 2001, and an amended petition on March 19, 2004.  Along with his petition, Wellons sought leave to conduct discovery on the judge, juror, and bailiff misconduct claims, as well as authorization and payment for expert examinations. In a series of orders, the district court first concluded that Wellons's claims of judge, juror, and bailiff misconduct were procedurally barred, and accordingly denied his motion for an evidentiary hearing on these claims.  The court later vacated that ruling with respect to the bailiff misconduct claim, but nonetheless denied that claim on the merits.  The court also denied Wellons's request for an evidentiary hearing on his method of execution claim.  In its final order, the district court concluded that Wellons's remaining claims—regarding the *Sabel* ruling,

---

[4] Even though it had denied Wellons's ineffectiveness claim on *Strickland*'s deficient-performance prong, the state habeas court nonetheless proceeded to examine the claim under *Strickland*'s second prong assuming, arguendo, Jones's performance was deficient.  As to the second *Strickland* prong, the court agreed with the Georgia Supreme Court and found that Wellons was not prejudiced by the absence of expert testimony during the guilt phase of trial because his mental health defenses were not viable.

ineffective assistance of counsel caused by the *Sabel* ruling, and method of execution—did not entitle him to federal habeas relief, and it denied Wellons's petition on the merits.

Wellons appeals the district court's denial of his habeas petition. The district court also granted a certificate of appealability as to its orders denying Wellons's application for an evidentiary hearing and discovery on his judge, juror, and bailiff misconduct claims and his method of execution claim.

## II. FEDERAL HABEAS CORPUS STANDARD OF REVIEW

We review the district court's denial of a petition for writ of habeas corpus *de novo*. *Jamerson v. Sec'y for Dep't of Corr.*, 410 F.3d 682, 687 (11th Cir. 2005). Likewise, we review the district court's conclusions of law and mixed questions of law and fact *de novo*. *Parker v. Head*, 244 F.3d 831, 836 (11th Cir. 2001). We review the district court's findings of fact for clear error. *Id.*

Because Wellons timely filed his first petition for federal habeas corpus relief on May 18, 2001, and is in state custody, his application for habeas relief is governed by 28 U.S.C. § 2254(d), as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104–132, 110 Stat. 1214 (1996). AEDPA establishes a "'highly deferential standard for reviewing state court judgments.'" *Jamerson*, 410 F.3d at 687 (quoting *Parker v. Sec'y for Dep't*

16

*of Corr.*, 331 F.3d 764, 768 (11th Cir. 2003)).  Thus, pursuant to § 2254(d), we have the authority to grant a writ of habeas corpus with respect to claims "adjudicated on the merits in State court proceedings" only when the State court's adjudication of those claims

> resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or . . . resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  The text of § 2254(d) outlines the scope of "clearly established Federal law" to include only those decisions by the United States Supreme Court.  *Id.*  In *Williams v. Taylor*, 529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000), the Supreme Court interpreted § 2254(d) to limit federal habeas analysis to the Court's holdings, not dicta, as of the time the state court adjudicated the petitioner's claims.  *Id.* at 412, 120 S. Ct. at 1523 (opinion of O'Connor, J.).

A state court's adjudication is "contrary to" federal law if it "arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts."  *Id.* at 413, 120 S. Ct. at 1523.  On the other hand, a state court's adjudication is "an unreasonable application of" clearly established federal law if the state court "identifies the correct governing legal

17

principle from th[e] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* To issue the writ in either case, the state court's application of federal law must be objectively unreasonable; we cannot grant habeas relief simply because we conclude that the state court applied federal law erroneously or incorrectly. *Id.* at 411, 120 S. Ct. at 1522; *see also Woodford v. Visciotti*, 537 U.S. 19, 27, 123 S. Ct. 357, 361, 154 L. Ed. 2d 279 (2002) (per curiam) ("The federal habeas scheme leaves primary responsibility with the state courts for these judgments[] and authorizes federal-court intervention only when a state-court decision is objectively unreasonable.").

In reviewing whether a state court's decision was based on an "unreasonable determination of the facts" under § 2254(d)(2), we presume the state court's factual findings are correct absent the petitioner's showing of clear and convincing evidence to the contrary. 28 U.S.C. § 2254(e)(1); *see also Miller-El v. Cockrell*, 537 U.S. 322, 340, 123 S. Ct. 1029, 1041, 154 L. Ed. 2d 931 (2003); *Parker v. Head*, 244 F.3d at 835–36. This statutory presumption of correctness applies to the factual determinations of both state trial and appellate courts. *Bui v. Haley*, 321 F.3d 1304, 1312 (11th Cir. 2003). It does not apply, however, to state-court determinations on mixed questions of law and fact, which we review *de novo*. *Parker*, 244 F.3d at 836.

18

Finally, we review a federal habeas court's denial of an evidentiary hearing for abuse of discretion. *Schriro v. Landrigan*, — U.S. —, 127 S. Ct. 1933, 1939, 167 L. Ed. 2d 836 (2007). With these standards of review in mind, we now turn to Wellons's claims.

## III. DISCUSSION

### A. *Judge, Juror, and Bailiff Misconduct*

On appeal, Wellons contends that the jurors' chocolate "gifts" to the judge and bailiff and the judge's conversation with jurors at the restaurant are prima facie evidence of an inappropriate relationship between the judge, jurors and bailiff, that if he were allowed to prove at a hearing, would entitle him to habeas relief. He argues that the district court erred in denying his motions for discovery and an evidentiary hearing to develop his judge, juror, and bailiff misconduct claims because they are not procedurally barred.[5]

_____

[5] Wellons further disputes the application of § 2254(e)(2)'s bar to his request for a hearing. Section 2254(e)(2) provides a federal habeas court shall not hold an evidentiary hearing on a claim for which the petitioner fails to develop the factual basis unless he can show that (A) the claim relies on (i) "a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court"; or (ii) "a factual predicate that could not have been previously discovered through the exercise of due diligence"; and (B) "the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense." 28 U.S.C. § 2254(e)(2). While the district court referenced § 2254(e)(2) in its discussion on the issue, its denial of Wellons's motion did not rest on § 2254(e)(2)'s bar, but rather on Wellons's failure to demonstrate "cause and prejudice" or "actual innocence" to permit review of the procedurally barred claims.

19

"A habeas petitioner, unlike the usual civil litigant in federal court, is not entitled to discovery as a matter of ordinary course." *Bracy v. Gramley*, 520 U.S. 899, 904, 117 S. Ct. 1793, 1796–97, 138 L. Ed. 2d 97 (1997). Thus, while the Federal Rules of Civil Procedure do not apply in federal habeas, the Supreme Court has fashioned certain discovery rules for habeas pursuant to its authority under the All Writs Act, 28 U.S.C. § 1651. *Bracy*, 520 U.S. at 904, 117 S. Ct. at 1797. The most pertinent rule provides:

> A party shall be entitled to invoke the processes of discovery available under the Federal Rules of Civil Procedure if, and to the extent that, the judge in the exercise of his discretion and for good cause shown grants leave to do so, but not otherwise.

Rule 6(a), Rules Governing § 2254 Cases (quoted in *Bracy*, 520 U.S. at 904, 117 S. Ct. at 1797).

When deciding whether to grant a federal habeas petitioner's request for an evidentiary hearing, "a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." *Landrigan*, —U.S.—, 127 S. Ct. at 1940. Because AEDPA provides great deference to state-court determinations, "a federal court must take into account those standards [of review] in deciding whether an evidentiary hearing is appropriate." *Id.* "It follows that if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a

20

district court is not required to hold an evidentiary hearing." *Id.*

Wellons was not entitled to discovery or an evidentiary hearing because the record reveals that his claims of judge, juror, and bailiff misconduct are procedurally barred from federal habeas review. With due consideration of comity and finality on collateral review of state criminal convictions, "federal courts will not disturb state court judgments based on adequate and independent state law procedural grounds." *Dretke v. Haley*, 541 U.S. 386, 392, 124 S. Ct. 1847, 1852, 158 L. Ed. 2d 659 (2004); *see also Wainwright v. Sykes*, 433 U.S. 72, 86–87, 97 S. Ct. 2497, 2506, 53 L. Ed. 2d 594 (1977). Because principles of fundamental fairness rest at the core of the writ of habeas corpus, the Court has "recognized an equitable exception to the bar when a habeas applicant can demonstrate cause and prejudice for the procedural default." *Haley*, 541 U.S. at 393, 124 S. Ct. at 1852. And, to guard against a fundamental miscarriage of justice, a petitioner may still be entitled to habeas absent a showing of cause and prejudice if he is actually innocent. *Id.* Under this narrow "actual innocence" exception, the petitioner must establish "'by clear and convincing evidence that, but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty under the applicable state law.'" *Id.* (quoting *Sawyer v. Whitley*, 505 U.S. 333, 336, 112 S. Ct. 2514, 2517, 120 L. Ed. 2d 269 (1992)).

When Wellons first learned of the chocolate "gifts" and the judge's conversation with jurors at the restaurant during defense counsel's post-trial interviews of the jurors, Wellons immediately moved for a new trial and to recuse the trial judge, who denied both motions. Wellons later raised the claims on direct appeal, and the Georgia Supreme Court rejected these claims as meritless. *See Wellons*, 463 S.E.2d at 880. On state habeas review, the Superior Court of Butts County did not address these claims, concluding that the Georgia Supreme Court's decision on direct review rendered them res judicata. As the state habeas court's ruling regarding these claims rests on an adequate and independent state procedural ground, the district court correctly found these claims procedurally barred from federal habeas review.[6]

Nevertheless, the district court allowed Wellons, in another round of briefing, to respond to the procedural bar with a showing of cause and prejudice. Wellons never presented such arguments. Because Wellons has demonstrated neither "cause and prejudice" nor "actual innocence" to overcome the procedural bar, his claims of judge, juror, and bailiff misconduct were not properly before the district court. We therefore conclude that the district court did not abuse its

---

[6] Contrary to Wellons's argument, whether the state habeas court properly concluded that these claims were barred pursuant to Georgia's procedural default rules or the state's doctrine of *res judicata* is irrelevant to our procedural default analysis. Under either scenario, the state habeas court's ruling rested on independent and adequate procedural grounds.

22

discretion in denying Wellons's requests for discovery or an evidentiary hearing on these procedurally barred claims.

Even if we assume that Wellons's misconduct claims are not procedurally barred, they do not entitle Wellons to habeas relief. The constitutional minimum established by the Due Process Clause requires that a criminal defendant receive a "fair trial in a fair tribunal, before a judge with no actual bias against the defendant or interest in the outcome of his particular case." *Bracy*, 520 U.S. at 904–05, 117 S. Ct. at 1797 (internal quotation marks and citation omitted). Due process also ensures the right to an impartial jury and that the fate of a defendant in a capital case not be decided by jurors harboring racial bias against him. *Morgan v. Illinois*, 504 U.S. 719, 729–31, 112 S. Ct. 2222, 2230, 119 L. Ed. 2d 492 (1992).

Wellons's alleged evidence of the jury's racial bias against him is grounded in his speculation as to the meaning underlying the jurors' chocolate "gifts" to the judge and bailiff. Wellons's claims of bias by the judge and bailiff are also grounded in the surmise attached to their passive receipt of these gifts. The Georgia Supreme Court reviewed Wellons's claims under Uniform Superior Court Rule 25.1, which requires a trial judge presented with a motion to recuse to "determine whether, assuming the truth of any of the facts alleged, a reasonable person might conclude that the judge harbors a bias, stemming from an extra-

23

judicial source, which is of such a nature and intensity that it would impede the exercise of impartial judgment." *Wellons*, 463 S.E.2d at 880. After examining Wellons's supporting affidavits, the Georgia court concluded that, assuming that Wellons's allegations regarding the gifts and the trial judge's communication with the jurors in a restaurant were true, there was no basis for finding that judicial bias existed. In light of the evidence presented before the Georgia Supreme Court, its determination is not based on an unreasonable determination of the facts.

The other misconduct claim stems from the trial judge's ex parte conversation with the jurors at the restaurant, which the judge never recounted on the record. Ex parte communications between the judge and jury are improper and, where they are of serious concern, the prejudice caused by such communications may mandate habeas relief. *See Rushen v. Spain*, 464 U.S. 114, 119, 104 S. Ct. 453, 456, 78 L. Ed. 2d 267 (1983) (per curiam). Improper though it may be, the occurrence of an unrecorded ex parte communication between a trial judge and juror, standing alone, does not require that a conviction be overturned. *See id.* at 117–18, 104 S. Ct. at 455 (explaining that the deprivation of a criminal defendant's right to personal presence at all critical stages is subject to harmless error analysis and stating, "the Constitution does not require a new trial every time a juror has been placed in a potentially compromising situation" (internal quotation marks

24

omitted)).

As the Supreme Court has recognized, the day-to-day realities of courtroom life make it "virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote." *Id.* at 118, 104 S. Ct. at 456 (internal quotation marks omitted). With respect to judge-juror contact, "[t]here is scarcely a lengthy trial in which one or more jurors do not have occasion to speak to the trial judge about something, whether it relates to a matter of personal comfort or to some aspect of the trial." *Id.*, 104 S. Ct. at 455–56. Generally, if the communication relates to some aspect of the trial, the judge should disclose it to counsel for all parties, and—especially in the context of a murder trial—she should do so on the record. *See id.* at 119, 104 S. Ct. at 456. In this case, Wellons argues that the judge's failure to disclose the communication perpetuated a veil of secrecy over the jurors' bias against him. Any prejudice caused by a judge's failure to make this disclosure "can normally be determined by a post-trial hearing[;] [t]he adequacy of any remedy is determined solely by its ability to mitigate constitutional error, if any, that has occurred." *Id.* at 119–20, 104 S. Ct. at 455. While there was no immediate post-trial hearing in this case that recounted the factual basis of the claim, the issues related to the judge's ex parte communication and the jurors' alleged bias were heard by the Georgia Supreme Court, which

25

found no basis for concluding judicial bias existed. *Wellons*, 463 S.E.2d at 880. The Georgia Supreme Court's judgment as to the substance and effect of the ex parte communication is a finding of fact to which we apply a presumption of correctness and may overturn "only if it lacks even fair support in the record." *Spain*, 464 U.S. at 120, 104 S. Ct. at 456 (internal quotation marks and alteration omitted). There is no indication in the record that the communication created judicial or juror bias so as to deprive Wellons of a fair trial. Thus, even if these claims were properly before us on habeas review, we would not disturb the Georgia Supreme Court's conclusion on the merits of these claims.

B. *Sabel Claim*

Wellons argues that the trial court's *Sabel* ruling violated his due process right to present his insanity and mentally ill defenses. He claims that the ruling amounted to constitutional error under *Wardius v. Oregon*, 412 U.S. 470, 93 S. Ct. 2208, 37 L. Ed. 2d 82 (1973), and argues that this error is not harmless because the risk of full disclosure to the prosecution chilled his investigation and consultation with mental health experts, which were critical to his defense.

In *Wardius*, the Supreme Court addressed the constitutionality of an Oregon trial court's ruling that prevented a criminal defendant from presenting any alibi evidence as a sanction for the defense's failure to comply with the state's notice-

of-alibi discovery rule that did not provide for reciprocal discovery. 412 U.S. at 471–72, 93 S. Ct. at 2210–11. Although the Court had previously upheld the constitutionality of notice-of-alibi rules as a general matter, *see Williams v. Florida*, 399 U.S. 78, 90 S. Ct. 1893, 26 L. Ed. 2d 446 (1970), the Court "emphasized that the constitutionality of such rules might depend on 'whether the defendant enjoys reciprocal discovery against the State,'" *Wardius*, 412 U.S. at 471, 93 S. Ct. at 2210 (quoting *Williams*, 399 U.S. at 82 n.11, 90 S. Ct. at 1896 n.11). Deciding the issue left open in *Williams*, the Supreme Court held that notice-of-alibi rules that do not provide for reciprocal discovery rights between the defendant and the prosecution violate the Due Process Clause of the Fourteenth Amendment. *Wardius*, 412 U.S. at 472, 93 S. Ct. at 2211. The Oregon notice-of-alibi rule at issue granted no discovery rights to the defendant, with the possible exception of allowing the defendant to view written statements by the defendant and state witnesses in police possession. *Id.* at 475 & n.8, 93 S. Ct. at 2212 & n.8. Consequently, the Court struck down the Oregon rule, "hold[ing] that in the absence of a strong showing of state interests to the contrary, discovery must be a two-way street. The State may not insist that trials be run as a 'search for truth' so far as defense witnesses are concerned, while maintaining 'poker game' secrecy for its own witnesses." *Id.* at 475, 93 S. Ct. at 2212. The Court made clear that while

the Due Process Clause does not reach so far as to prescribe specific discovery rules in a criminal trial, "[i]t is fundamentally unfair to require a defendant to divulge the details of his own case while at the same time subjecting him to the hazard of surprise concerning refutation of the very pieces of evidence which he disclosed to the State." *Id.* at 476, 93 S. Ct. at 2212–13.

In this case, the trial court maintained that pursuant to *Sabel*, the defense must disclose the identities and reports of any mental health experts consulted regardless of whether they would testify at trial. While Wellons's direct appeals were pending, however, the Georgia Supreme Court overruled *Sabel*, holding that the prosecution is only entitled to discover those scientific reports by expert witnesses that the defense intends to call at trial. *Rower*, 443 S.E.2d at 842. The Georgia Supreme Court reasoned that while the Due Process Clause does not prevent a state from implementing broad discovery systems in criminal cases so long as there is a "balance of forces" between the state and the defendant, "the discovery rights granted to the state under *Sabel* are not reciprocal, but are, in fact, greater than the statutory discovery rights granted to the defendant by O.C.G.A. § 17-7-211." *Rower*, 443 S.E.2d at 842 (quoting *Wardius*, 412 U.S. at 474, 93 S. Ct. at 2211–12). Because *Rower* was decided on interim review, however, the Georgia Supreme Court had no occasion to address the prejudicial effect, if any, caused by

28

the trial court's *Sabel* ruling.

The Georgia Supreme Court addressed that issue in *Wellons*, 463 S.E.2d 868. After concluding that *Rower* applied retroactively to Wellons's appeal because it was "in the pipeline" when *Rower* was decided, the court applied harmless-error analysis to Wellons's *Sabel* chilling effect claim. *Id.* at 876. The Georgia Supreme Court found that although the trial court's ruling was erroneous under *Rower*, that error was nonetheless harmless because Wellons did not make any expert disclosures. *Id.*

*Wardius* and *Rower* make clear that the trial court's *Sabel* ruling in Wellons's case violated the Due Process Clause of Fourteenth Amendment because it granted the prosecution greater discovery rights than Wellons possessed in preparing for trial.[7] The main question is whether the constitutional error in the *Sabel* ruling was harmless error.[8]

The Supreme Court has declined to adopt a rule that all federal constitutional

_____

[7] In fact, as soon as the defense disclosed the identities of the experts they consulted, the prosecution subpoenaed these witnesses, arguing under *Sabel* that if the defense did not call these witnesses, the state may elect to do so.

[8] In his initial brief, Wellons argued that harmless-error analysis is inapplicable to his case because the *Sabel* ruling was not "trial-type" error, but rather a "structural defect" in his trial as it "completely precluded him from presenting his defense to the jury." Brief for Appellant at 40–41. During oral argument, however, Wellons abandoned this argument by conceding that harmless-error was the appropriate framework. Therefore, we only address whether the Georgia Supreme Court's decision that the *Sabel* error was harmless is contrary to, or an unreasonable application of, clearly established federal law.

errors committed during the course of a criminal trial require reversal of subsequent convictions. *Chapman v. California*, 386 U.S. 18, 21–22, 87 S. Ct. 824, 827, 17 L. Ed. 2d 705 (1967). In *Chapman*, the Court explained that it has long been the rule in both state and federal court that "judgments shall not be reversed for 'errors or defects which do not affect the substantial rights of the parties.' *Id.* at 22, 87 S. Ct. at 827 (quoting 28 U.S.C. § 2111).

In deciding whether the trial court's *Sabel* ruling constituted harmless or reversible error, we must examine the ruling in the context of Wellons's trial to assess the extent of any prejudicial effect. In *Brecht v. Abrahamson*, 507 U.S. 619, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993), the Supreme Court held that on federal habeas, courts must assess the prejudicial impact of constitutional error in a state criminal trial under the "substantial-and-injurious-effect" standard and not under *Chapman*'s "harmless-beyond-a-reasonable-doubt standard." *Id.* at 622, 113 S. Ct. at 1713–14. The history behind the great writ verifies habeas relief as an extraordinary remedy that serves as "a bulwark against convictions that violate fundamental fairness." *Id.* at 633–34, 113 S. Ct. at 1719 (internal quotation marks omitted). Because the writ is targeted to prevent a fundamental miscarriage of justice, "an error that may justify reversal on direct appeal [as in *Chapman*] will not necessarily support a collateral attack on a final judgment." *Id.* at 634, 133 S.

Ct. at 1720 (internal quotation marks omitted).  Under *Brecht*'s "substantial-and-injurious-effect" standard, "habeas petitioners may obtain plenary review of their constitutional claims, but they are not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice.'"  *Id.* at 637, 113 S. Ct. at 1722.

Although *Brecht* was decided before Congress's enactment of AEDPA in 1996, the Supreme Court recently confirmed the application of *Brecht*'s more deferential "substantial-and-injurious-effect" standard when assessing the prejudicial impact of constitutional error on federal habeas review.  *Fry v. Pliler*, — U.S.—, 127 S. Ct. 2321, 168 L. Ed. 2d 16 (2007).  In *Fry*, the Court rejected the petitioner's argument that AEDPA replaced *Brecht*'s standard for reviewing constitutional error because AEDPA was designed to further limit the availability of habeas relief.  *Id.* at 2327.  Therefore, the Court deemed it "implausible that, without saying so, AEDPA replaced the *Brecht* standard of 'actual prejudice' with the more liberal AEDPA/*Chapman* standard which requires only that the state court's harmless-beyond-a-reasonable-doubt determination be *unreasonable*."  *Id.* (emphasis added) (internal quotation marks and citation omitted).

The *Fry* Court also rejected the argument that its holding in *Mitchell v. Esparza*, 540 U.S. 12, 124 S. Ct. 7, 157 L. Ed. 2d 263 (2003) (per curiam), a post-

31

AEDPA case, eliminated the need to show "actual prejudice." *Fry*, 127 S. Ct. at 2326–27. In *Esparza*, the Court held that where a state court has determined that a constitutional error is harmless, a federal court may not grant habeas relief under § 2254(d)(1) unless the state court's harmless error analysis was objectively unreasonable. 540 U.S. at 17–18, 124 S. Ct. at 11–12. The *Fry* Court did not abandon *Esparza*'s interpretation of AEDPA to review of constitutional errors on collateral attack, but nonetheless emphasized that Brecht's "actual prejudice" standard is the proper lense by which to "assess[] the prejudicial impact of federal constitutional error in a state-court criminal trial." *Fry*, 127 S. Ct. at 2327.

Because the Georgia Supreme Court found the *Sabel* error harmless, Wellons will be entitled to receive habeas relief only if the Georgia Supreme Court's harmless error determination was objectively unreasonable in light of clearly established law, viz., *Brecht*.

The Georgia Supreme Court deemed the *Sabel* error harmless because the evidence as a whole demonstrated that Wellons had no viable insanity and mental illness defense nor a viable actual innocence defense. *Wellons*, 463 S.E.2d at 876. Compared to other cases with a "greater showing of mental health problems," the court found that "[t]he evidence of guilt was overwhelming." *Id.* (citing *Bright v. State*, 455 S.E.2d 37 (Ga. 1995)). The court found that despite the *Sabel* ruling,

32

Wellons presented ample mitigation testimony from 17 witnesses, although he presented no mental health evidence during the guilt-innocence phase. *Id.* at 876. It concluded:

> [T]he error, though it might well have initially had a chilling effect on consultation with experts, was ultimately harmless. The chilling effect could have been and apparently was cured after Wellons decided to raise the insanity defense. His counsel made an intelligent, strategic choice not to contest Wellons' participation in the crimes, to merely introduce the idea of mental illness in the guilt-innocence phase of trial, and then to bring every effort to bear in mitigation.

*Id.* at 876–77. While the discussion was not framed in the precise language used in *Brecht*, this discussion follows the "substantial and injurious effect" analysis. It is clear that in assessing the effect of the *Sabel* error on Wellons's trial, the Georgia Supreme Court examined the record as a whole. *See Brecht*, 507 U.S. at 638, 113 S. Ct. at 1722 ("Our inquiry here is whether, in light of the record as a whole, the State's improper use for impeachment purposes of petitioner's post-*Miranda* silence . . . 'had substantial and injurious effect or influence in determining the jury's verdict.'"). As such, the Georgia Supreme Court's harmless error analysis was not contrary to, or an unreasonable application of *Brecht*. Consequently, we cannot grant Wellons relief on the basis of this claim.

C. *Ineffective Assistance of Counsel*

Wellons's ineffective assistance of counsel claims overlap with his *Sabel*

arguments. He presents two theories of ineffectiveness. First, he argues that the *Sabel* ruling rendered his trial counsel ineffective by having to choose between risking prejudicial disclosure of negative expert reports or foregoing expert testimony to support his mental health defense at trial. Second, Wellons argues that his trial counsel was ineffective in implementing its chosen strategy after it became clear that the trial court would not reverse its *Sabel* rulings.

Wellons's ineffectiveness arguments are governed by test set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). Under *Strickland*'s two-pronged analysis, Wellons must show (1) that his trial counsel's performance was deficient, and (2) that the deficiency deprived Wellons of a fair trial, "a trial whose result is reliable." *Id*. at 687, 104 S. Ct. at 2064.

Because we have held that the Georgia Supreme Court's conclusion that the *Sabel* ruling is harmless error is not contrary to, nor an unreasonable application of *Brecht*, Wellons's argument that the *Sabel* ruling rendered counsel constitutionally ineffective is foreclosed. Wellons's alternative ineffectiveness argument—that trial counsel were constitutionally ineffective in implementing the defense and mitigation strategies chosen in response to the *Sabel* ruling—also lacks merit. To show deficiency under the first prong of his ineffectiveness claim, Wellons must show that his trial counsel's performance was not reasonable under the

34

circumstances. *Strickland*, 466 U.S. 688, 104 S. Ct. at 2065. This is a highly deferential standard by which we look to "[p]revailing norms of practice as reflected in American Bar Association standards and the like . . . [as] guides to determining what is reasonable." *Id.* To meet this high burden, "[a] convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Id.* at 690, 104 S. Ct. at 2066. "The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Id.*

Wellons argues that his trial counsel's performance was unreasonable because they did not adequately investigate and present "key witnesses" to testify about his family history of substance abuse, sexual dysfunction, sexual abuse, and neurological impairment at both stages of his trial. Wellons argues that had counsel pressed on in its investigation regardless of the trial court's *Sabel* rulings, counsel would have discovered expert opinions presented by Dr. Wood during the state habeas proceeding, in which he concluded that Wellons was legally insane when he killed India Roberts. According to Wellons, trial counsel also would have had the benefit of Dr. Grant's expert testimony, which was also presented at the state habeas proceeding. Dr. Grant testified that Wellons suffers from severe

neurological impairments, Post-Traumatic Stress Disorder, and possibly an epileptiform seizure disorder. As for his ineffectiveness claims at the penalty phase, Wellons acknowledges that trial counsel interviewed several people and presented 17 mitigation witnesses—including a sociologist and psychologist—but nonetheless argues that counsel was deficient in investigating his background.

"A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689, 104 S. Ct. at 2065. We cannot ignore the circumstances under which counsel made the decision to forego mental health expert testimony during the guilt phase of trial. Wellons's trial counsel faced a very difficult choice as a result of the *Sabel* ruling. If they decided to pursue expert testimony, and the expert reports proved unfavorable for Wellons, the prosecution would have been entitled to these reports and could have called the very experts Wellons's counsel declined to present. In light of all this, the Georgia Supreme Court's conclusion that Wellons's counsel "made an intelligent, strategic choice not to contest Wellons' participation in the crimes, to merely introduce the idea of mental illness in the guilt-innocence phase of trial, and then to bring every effort to bear in mitigation," *Wellons*, 463 S.E.2d at 876–77, is

36

neither contrary to, nor an unreasonable application of *Strickland*.

D. *Constitutionality of Georgia's Death Penalty System*

Wellons attacks the constitutionality of Georgia's use of the three-drug protocol method of execution by lethal injection. He argues that the three-drug protocol violates the Eighth Amendment's prohibition against cruel and unusual punishment and that the district court erred in denying an evidentiary hearing on his Eighth Amendment claim. Both of these claims have been foreclosed by *Baze v. Rees*, — U.S. —, 128 S. Ct. 1520, 170 L. Ed. 2d 420 (2008), in which the United States Supreme Court upheld a similar three-drug lethal injection protocol as not constituting cruel and unusual punishment under the Eighth Amendment.[9]

IV.  CONCLUSION

We conclude that the district court did not err in denying Wellons's motions for discovery and an evidentiary hearing on his judge, juror, and bailiff misconduct claims. Nor did the district court err in denying Wellons's due process and ineffective assistance of counsel claims related to the *Sabel* error because the state court's decisions were neither contrary to, nor an unreasonable application of

---

[9] Wellons also argues that the Georgia death penalty system violates the Equal Protection Clause of the Fourteenth Amendment because it is administered without uniform and specific standards. Wellons's allegations fail to establish a prima facie case of intentional discrimination against a protected class. As the Supreme Court has emphasized, "there is not 'any one right way for a State to set up its capital sentencing scheme.'" *Morgan v. Illinois*, 504 U.S. 719, 725–26, 112 S. Ct. 2222, 2228, 119 L. Ed. 2d 492 (1992) (quoting *Spaziano v. Florida*, 468 U.S. 447, 464, 104 S. Ct. 3154, 3164, 82 L. Ed. 2d 340 (1984)).

37

clearly established Supreme Court law, viz., *Brecht* and *Strickland*. We also conclude that the district court did not err in rejecting Wellons's claims regarding Georgia's death penalty system. For the foregoing reasons, we affirm the district court's order denying Wellons's habeas petition.

AFFIRMED.