[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
May 18, 2009
THOMAS K. KAHN
CLERK

_____

No. 07-14727

_____

D. C. Docket No. 03-81152-CV-DLG

DUANE E. OWEN,

Petitioner-Appellant,

versus

SECRETARY FOR THE DEPARTMENT OF CORRECTIONS,
ATTORNEY GENERAL OF THE STATE OF FLORIDA,

Respondents-Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(May 18, 2009)

Before DUBINA, HULL and MARCUS, Circuit Judges.

HULL, Circuit Judge:

In this capital case, Duane E. Owen appeals the district court's denial of his 28 U.S.C. § 2254 petition for a writ of habeas corpus challenging his convictions for the murder and sexual battery of Georgianna Worden and his death sentence on the murder conviction. The certificate of appealability ("COA") encompasses fourteen claims that fall into four categories: (1) five ineffective-trial-counsel claims that the state collateral court found procedurally barred because Owen refused to proceed at his evidentiary hearing; (2) one ineffective-appellate-counsel claim that the state collateral court found procedurally barred because it was insufficiently pled and proven; (3) three other ineffective counsel claims that the state collateral court found procedurally barred because they were raised and litigated on state direct appeal; and (4) five claims that the district court denied on the merits.[1] After review and oral argument, we conclude the district court properly found the first category of claims procedurally barred from federal habeas review but erred in concluding the next two categories of claims were procedurally barred from federal habeas review. Nonetheless, we conclude that all of Owen's

_____

[1]Owen was granted a COA on one more claim – that some of the penalty-phase jury instructions were unconstitutional – but Owen did not brief that claim in this appeal and thus abandoned it. See Mize v. Hall, 532 F.3d 1184, 1189 n.3 (11th Cir. 2008) (stating that claim for which § 2254 petitioner was granted COA in district court but which he did not brief on appeal to this Court was abandoned).

claims not procedurally barred lack merit. Thus, we affirm the denial of Owen's §

2254 petition.

## I. BACKGROUND

Before we review the lengthy procedural history, we note a few background

facts. Owen received two separate death sentences, following separate trials, for

murdering two people: Georgianna Worden and Karen Slattery. Owen confessed

to both murders. This petition concerns only the Worden murder. But we detail

the Slattery proceedings because they form the basis for a number of Owen's

arguments. We outline a global picture of the two parallel proceedings to provide

context for our subsequent discussion.

### A.      The Crimes

The Worden murder is the subject of this appeal. On the night of May 28,

1984, Georgianna Worden was asleep at her home in Boca Raton, Florida. Owen

v. State, 596 So. 2d 985, 986 (Fla. 1992) ("Owen/Worden I"). Owen broke into

the house, grabbed a knife and a hammer from the kitchen, and went to Worden's

bedroom. Id. at 990. As Worden lay sleeping, Owen struck her on the head with

the hammer. Id. She awoke screaming and struggling, and Owen struck her four

more times on the head and face. Id. Worden's "neck was constricted with

sufficient force to break the bones therein," and "[s]he was sexually assaulted and

3

the walls of her vagina were torn by a foreign object, such as the hammer handle." Id. at 990. The evidence suggested Worden lived "for a period of from several minutes to an hour" after the first blow. Id. The evidence also showed that before he attacked Worden, Owen "selected the victim, removed his own outer garments to prevent them from being soiled by blood, placed socks on his hands, broke into the home, [and] closed and blocked the door" to the room in which Worden's school-age children were sleeping. Id. Worden's children found her body the next morning. Id. at 986.

Two months earlier, Owen had murdered Slattery in similar fashion. On the evening of March 24, 1984, fourteen-year-old Karen Slattery was babysitting for a married couple in Delray Beach, Florida. Owen v. State, 560 So. 2d 207, 209 (Fla. 1990) ("Owen/Slattery I"). Around 10:00 p.m., Owen entered the house by cutting the screen to the bedroom window. Id. He confronted Slattery, stabbed her eighteen times, dragged her to the bedroom, and sexually assaulted her. Id.; Owen v. State, 862 So. 2d 687, 700 (Fla. 2003) ("Owen/Slattery III"). The couple for whom Slattery was babysitting found her body when they returned home shortly after midnight. Owen/Slattery I, 560 So. 2d at 209.

B.     The Two Confessions

On May 29, 1984, the day Worden's body was found, Boca Raton police

4

arrested Owen on unrelated burglary charges and outstanding warrants.

Owen/Worden I, 596 So. 2d at 986-87; Owen/Slattery I, 560 So. 2d at 209.   Over

the next few weeks, police questioned Owen about a number of crimes.

Owen/Worden I, 596 So. 2d at 986-87; Owen/Slattery I, 560 So. 2d at 209.  On

June 21, 1984, Owen confessed to the Worden murder.  The Florida Supreme

Court summarized Owen's interrogation and confession as follows:

> During these interrogations, Owen . . . specifically stated that he did
> not want a lawyer present but he asked that a certain officer ([Lt.
> Mark] Woods) from Delray Beach who knew him from previous
> encounters be present for the interrogation.  After confessing to
> numerous burglaries, sexual batteries, and other lesser crimes, he
> refused to talk further to the police about the [Worden] murder and
> terminated the interrogation.  On June 18, he reinitiated contact with
> the police and renewed his spate of confessions.  He also corrected
> and amplified earlier confessions.  On June 21, the Delray Beach
> police obtained an inked impression of Owen's footprints and the
> Boca Raton police informed him that, based on fingerprints taken
> from the [Worden] crime scene and other evidence, they were
> charging him with first-degree murder.  After the Boca Raton police
> presented their evidence to Owen, he confessed to the [Worden]
> burglary, sexual battery, and murder.  His account of this crime was
> remarkably similar to his earlier confessions to three crimes where he
> removed his clothes, committed a burglary, and either choked or
> bludgeoned sleeping victims into unconsciousness before committing
> sexual battery.

Owen/Slattery I, 560 So. 2d at 209-210.  After the Worden confession, the

interrogation continued and Owen confessed later that day to the Slattery murder.

5

Id. at 210.[2]  In both the Worden and Slattery cases, Owen was indicted for first-degree murder, sexual battery, and burglary of a dwelling with intent to commit sexual battery inside.

## C.    Motion to Suppress and Slattery Trial

In late 1984, Owen's public defender moved jointly in the Worden and Slattery cases to suppress all of Owen's statements to the police.  In February 1985, the trial court appointed the law firm of Kohl, Springer, Springer, Mighdoll, Salnick, and Krischer to represent Owen in the Worden, Slattery, and nine other cases.  Owen later amended his motion to suppress several times.

The trial court denied Owen's suppression motion.  The trial court found that the police properly arrested Owen; that Owen was properly informed of his Miranda rights; that Owen was aware of the potential penalties for the crimes of which he was suspected; that Owen initiated much of the discussion with police; that police did not physically or psychologically coerce Owen into confessing; and that Owen's confessions were freely and voluntarily made.

---

[2]The Florida Supreme Court recounted the Slattery confession:
Immediately after the above confession to the [Worden] murder, the Delray Beach police interrogated Owen relative to the [Slattery] crime.  He first denied any knowledge of this crime, but confessed after the police confronted him with the bloody footprint from the crime scene and the inked impression of his foot taken earlier that day.  The details were again remarkably similar to those of the earlier confessions.
Owen/Slattery I, 560 So. 2d at 210.

6

After Owen confessed to murdering Worden, the police questioning about Slattery continued and created legal issues apart from the Worden murder. When questioned about certain details of the Slattery murder, Owen twice said he would "rather not talk about it." The questioning continued as to other details of the crime and, after a break, Owen ultimately confessed to murdering Slattery.[3] The trial court found Owen never invoked his <u>Miranda</u> right to silence.

After the 1985 evidentiary hearing on the suppression motion, the law firm representing Owen dissolved and his many cases were divided among the lawyers formerly in the firm. Owen was tried in the Slattery case first, and Barry Krischer and Michael Salnick represented Owen. The State introduced Owen's confession and other corroborating evidence, including the bloody footprint. Owen was convicted on all charges. The jury recommended, and the trial judge imposed, a

---

[3]During the Slattery questioning, Officer Lincoln asked Owen to satisfy himself that the police had enough evidence to convict him, and then to confess, as Owen had done with the Worden murder. Lincoln began asking Owen about details of the Slattery crime. He asked Owen, "Were you looking at that particular house or just going through the neighborhood?" Owen said, "I'd rather not talk about it." Lincoln responded, "Why? You don't have to tell me about the details if you don't want to[,] if you don't feel comfortable about that." The officers moved to questions about other details of the Slattery crime and Owen's whereabouts that evening. Owen continued talking. After Owen answered more questions, the officers began talking about a bicycle spotted near the murder scene that night, and asked Owen if he had a bicycle and where he put it. Owen responded, "I don't want to talk about it." Lincoln stated, "I won't make you tell me something you're not comfortable in talking about, Duane. But I do want to know some of the things that shouldn't hurt you that much to talk about." Lincoln switched to another line of inquiry, and the questioning continued. After a break, questioning resumed, and Owen confessed to murdering Slattery.

death sentence for murdering Slattery.

## D.    Worden Trial and Sentencing

Subsequently, in 1986, Owen was tried in the Worden case. Craig Boudreau and Donald Kohl represented Owen. The evidence included Owen's confession, his fingerprint on a library book in Worden's home, and other corroborating evidence. The jury convicted Owen on all charges. Again the jury recommended, and the trial judge imposed, a death sentence.

The trial judge found four aggravating circumstances: (1) Owen was previously convicted of a violent felony;[4] (2) Owen committed the Worden murder during a burglary/sexual battery; (3) the murder was especially heinous, atrocious, or cruel; and (4) the murder was cold, calculated, and premeditated. The trial judge considered these mitigating factors: (1) Owen's mother died when he was very young and his father committed suicide a year later; (2) Owen and his brother were shuffled from one foster home to another until his brother ran away, abandoning him; (3) Owen was physically and sexually abused in the foster homes; (4) Owen's mind "snapped" during the Worden murder; and (5) Owen enlisted twice in the Army and aspired to become a policeman.

---

[4]In addition to the Slattery crimes, Owen was convicted of the attempted first-degree murder of Marilee Manley and the armed burglary of her home.

**E.      Slattery Direct Appeal and Retrial**

Before discussing the Worden direct appeal, we review the earlier Slattery direct appeal.  Owen argued, <u>inter alia</u>, that his Slattery confession was inadmissible because he displayed an unwillingness to talk to police.  The Florida Supreme Court reversed, noting that Owen (<u>after</u> confessing to the Worden murder but <u>before</u> confessing to the Slattery murder) twice expressed his unwillingness to talk, though it was unclear whether Owen was referring to the questioning in general or just particular details about the Slattery murder.  <u>Owen/Slattery I</u>, 560 So. 2d at 210-211.  The Florida Supreme Court concluded that Owen invoked his <u>Miranda</u> rights and the officers should have terminated further questioning about Slattery.  <u>Id.</u> at 211. However, after this ruling, the United States Supreme Court, in <u>Davis v. United States</u>, 512 U.S. 452, 114 S. Ct. 2350 (1994), held that police need <u>not</u> stop questioning a suspect when the suspect makes an ambiguous or equivocal statement about wanting an attorney.  <u>See</u> <u>id.</u> at 461, 114 S. Ct. at 2356.

The Florida Supreme Court then reconsidered Owen's Slattery confession. It concluded that, "contrary to our belief at the time, federal law did not require us to rule Owen's confession inadmissible."  <u>State v. Owen</u>, 696 So. 2d 715, 718 (Fla. 1997) ("<u>Owen/Slattery II</u>").  <u>Davis</u>'s principles about equivocal statements (there, requesting an attorney) applied equally to a suspect's invocation of the right

to remain silent.  See id. at 717-18.  The Florida Supreme Court determined that Florida law, the same as federal law, requires an unequivocal statement of a suspect's desire that questioning terminate.  Id. at 719.  Owen's statements were equivocal.  Id. at 720 & n.8.  Thus, this time the Florida Supreme Court found no Miranda violation, but having already vacated the Slattery convictions, ordered Owen to be retried.  Id. at 720.

Upon retrial in 1999, Owen was again convicted of the Slattery crimes.  The jury recommended, and the trial court imposed, another death sentence.  On direct appeal, the Florida Supreme Court affirmed.  Owen/Slattery III, 862 So. 2d at 704.

## F.  Worden Direct Appeal

In January 1992, the Florida Supreme Court affirmed Owen's Worden convictions and sentence.  Owen/Worden I, 596 So. 2d at 987-90.  The Florida Supreme Court concluded that: (1) Owen was lawfully arrested; (2) the trial court properly denied Owen's motion to suppress his Worden confession; (3) the trial court properly denied Owen's motion for judgment of acquittal on the sexual battery charge because (a) "[w]hether the victim was alive or dead at the time of sexual union . . . is an issue of fact to be determined by the jury" and (b) substantial competent evidence supported the jury's finding; (4) the trial court did not err in finding that the burglary/sexual battery was an aggravating factor because the jury

10

was entitled to find that Worden was alive during the sexual contact; and (5) Owen's argument that the police violated his due process rights by not videotaping every interview was "totally without merit." Id. at 987.

The Florida Supreme Court specifically rejected Owen's psychological-coercion argument, stating that it "has already been rejected by this Court" in Owen's direct appeal in the Slattery case. Id. That appeal concluded the videotapes showed Owen initiated the interrogation sessions, police repeatedly advised Owen of his rights to counsel and to remain silent, police did not coerce Owen, and Owen's confession was voluntary. Owen/Slattery I, 560 So. 2d at 210. As to Owen's Miranda claim, the Florida Supreme Court determined that Owen "was routinely informed of his rights and voluntarily waived them." Owen/Worden I, 596 So. 2d at 987. It noted that Owen's equivocal statements regarding not wanting to talk were made after Owen confessed to murdering Worden and therefore were irrelevant. Id. at 987 n.3.

The Florida Supreme Court also concluded that police did not violate Owen's Sixth Amendment right to counsel by interrogating him about the Worden murder without the lawyer appointed for Owen's unrelated burglary and warrant charges. It noted that the right to counsel "is offense-specific: attachment and invocation of the right on one charge imposes no restrictions on police inquiry

11

concerning other charges against the same defendant." Id. at 989 (citing McNeil v. Wisconsin, 501 U.S. 171, 111 S. Ct. 2204 (1991)).  Owen's right to counsel had attached only as to his initial burglary and outstanding warrant charges – not as to the Worden murder.  The interrogation occurred before Owen's first appearance on the Worden charges, and therefore he had no right to counsel then.  Id.

## G.    Worden State 3.850 Collateral Proceedings

Owen filed a Florida Rule of Criminal Procedure 3.850 motion in the state trial court (the "3.850 court").[5]  On November 5, 1997, the 3.850 court held a hearing, pursuant to Huff v. State, 622 So. 2d 982 (Fla. 1993), to determine which issues required an evidentiary hearing.  At the Huff hearing, the State conceded that these issues required an evidentiary hearing: (1) whether Owen's trial counsel in the Worden case (Boudreau and Kohl) provided ineffective assistance (a) in the use of mental health experts, (b) in failing to investigate a viable defense, (c) in failing to investigate and present mitigation evidence, and (d) in failing to raise

---

[5]Florida Rule of Criminal Procedure 3.850 provides, in pertinent part:
The following grounds may be claims for relief from judgment or release from custody by a person who has been tried and found guilty or has entered a plea of guilty or nolo contendere before a court established by the laws of Florida:
(1) The judgment was entered or sentence was imposed in violation of the Constitution or laws of the United States or the State of Florida.
Fla. R. Crim. P. 3.850(a)(1).

12

certain issues during trial;[6] and (2) whether Krischer (who handled the first Slattery trial) and Kohl failed to disclose various conflicts of interest. The 3.850 court left open the opportunity for Owen to present evidence regarding certain additional claims once Owen's collateral counsel reviewed the State's Slattery file.

On December 5, 1997, three days before the 3.850 evidentiary hearing, Carey Haughwout (Owen's counsel in the upcoming Slattery retrial) moved to stay the Worden 3.850 proceedings or, alternatively, to prohibit disclosure of privileged information. Because the members of one law firm initially were jointly appointed in 1985 to represent Owen in both the Slattery and Worden cases, Owen claimed the attorney-client privilege as to the pending Slattery retrial (1) was still in effect, and (2) extended to the attorneys who represented him in the Worden trial. Owen argued that litigating the Worden 3.850 motion would force a compelled waiver of the attorney-client privilege in the Slattery case.

The State opposed a stay but requested that the 3.850 court restrict the amount of disclosure to protect Owen's attorney-client privilege. The State assured the 3.850 court that its questioning of the Worden witnesses would not involve any matters in the Slattery case. In fact, Boudreau and Kohl represented Owen in the Worden trial, but separate counsel, Krischer and Salnick, represented

---

[6]See infra note 11.

13

Owen in the first Slattery trial.

The 3.850 court denied Owen's motion to stay but granted his alternative request to prohibit disclosures of privileged information. The 3.850 court prohibited disclosures relating to any of Owen's non-Worden cases. And it advised that any questions about confidential matters would be addressed as they developed. The 3.850 court permitted Haughwout to sit with Owen's Worden collateral counsel Pamela Izakowitz[7] during the evidentiary hearing to advise on any potential disclosures.[8] Nevertheless, before calling any witnesses, Izakowitz stated that Owen would not go forward with the Worden evidentiary hearing except for the limited purpose of showing that the attorney-client privilege in the Slattery case had not been waived.

The only witness Owen called was Krischer. In his testimony, Krischer acknowledged that although his former firm was appointed to represent Owen on all his criminal cases, Krischer had no responsibilities in trying the Worden case.

---

[7]Izakowitz is an attorney with the Office of the Florida Capital Collateral Regional Counsel.

[8]The 3.850 court heard argument on the motion to stay on the morning of the evidentiary hearing. The parties dispute whether Owen was asking for a stay until after the Slattery retrial and direct appeal (Owen's argument) or until after the retrial, direct appeal, and all collateral proceedings were concluded in the Slattery case (the State's argument). Because it does not matter to the result here, we will assume Owen was asking for a stay of the Worden case until after the Slattery retrial and direct appeal were concluded.

Krischer never discussed the Worden case or the details of the Worden murder with Owen. However, Krischer was one of the attorneys who litigated the suppression motion that applied to all of Owen's cases. Because of the pending Slattery retrial, Krischer refused to answer any questions relating to the suppression motion, mental health reports, or Owen's competence.

After Krischer was excused, Owen refused to put on any more witnesses. This colloquy ensued:

| | |
|---|---|
| Ms. Izakowitz: | In light of the Court's ruling, and in light of Mr. Krischer's testimony today, and in light of the fact that Mr. Owen feels that his rights are being chipped away as the witness–each witness who is going to come up will probably say the same thing, I don't feel that I could go forward anymore.<br>I am not abandoning any claims. I am not waiving any claims. I do not feel that it is in Mr. Owen's best interest to go forward. |
| The Court: | If you are telling me you are not planning to call any additional witnesses, I am prepared to enter an order denying Mr. Owen's 3.850 motion, Counselor; you realize that? |
| Ms. Izakowitz: | I understand that, Your Honor, I have to do– |
| The Court: | You discussed that with him? |
| Ms. Izakowitz: | I have to preserve Mr. Owen's rights. And I think, in light of this Court's rulings today, in light of Mr. Krischer and how he testified, yes, I understand that, Your Honor. |
| The Court: | You have discussed this with Mr. Owen? |
| Ms. Izakowitz: | Yes. |
| The Court: | Mr. Owen, you understand what she is telling me? |
| The Defendant: | Yes; we had discussions. |

15

| The Court: | You understand what she is telling me; she is planning not to pursue further your 3.850 motion at this time.  If it is not pursued, it is my intention to enter an order [denying] that 3.850.  That will be the end of it.  And if the Florida Supreme Court upholds that, that's the end of the case, 84-4000, insofar as any appellate rights.  You understand that? |
|---|---|
| The Defendant: | I am not an expert in the law but I have to rely upon what counsel stated. . . .   I understand what the Court has just said.  I don't understand the procedure. |

The 3.850 court then denied Owen's Rule 3.850 motion, noting Owen had called only one witness and had "announc[ed] his intention not to proceed further with the motion."

The Florida Supreme Court affirmed the denial of Owen's Rule 3.850 motion and the denial of his stay motion.  See Owen v. State, 773 So. 2d 510 (2000) ("Owen/Worden II").  Because Owen had filed ineffectiveness claims against his Worden counsel (Boudreau and Kohl), it concluded Owen waived his attorney-client privilege in the Worden case.  Id. at 514.  It also determined that Krischer knew nothing about the Worden trial, that Owen made no effort to proffer any substantive evidence even though the 3.850 court agreed to bar privileged information, and that Owen did not make a good faith effort to proceed with the Worden 3.850 hearing and thereby waived his Worden 3.850 claims:

16

> Although [Owen] . . . invoked the privilege in the Slattery case, he still was obligated to proceed in good faith in the present case to the extent that the privilege permitted. He did not do so. In fact, at the hearing below, he made no effort to introduce substantive evidence concerning the Worden trial. Instead, he called as his only witness Barry Krischer, i.e., his former trial counsel in the Slattery case. Krischer knew virtually nothing about the Worden trial and his testimony was guaranteed to implicate the privilege, which expressly applied only to the Slattery case. Further, although the court below agreed to bar disclosure of privileged information, Owen made no effort to proffer any substantive evidence that would have been excluded by the privilege. In short, Owen made no showing of prejudice. We find no abuse of discretion in the manner in which the court conducted the hearing.

Id. at 514-15. The Florida Supreme Court found that Owen waived his ineffective-assistance and conflict-of-interest claims because they "require[d] [factual] development at an evidentiary hearing, which Owen–by his actions below–opted to forego." Id. at 515. It determined that all of Owen's remaining 3.850 claims were procedurally barred under state law. Id.

**H.      Worden Successive 3.850 Motion and State Habeas Petition**

Subsequently, Owen filed a pro se successive Rule 3.850 motion that the 3.850 court summarily denied. Owen appealed to the Florida Supreme Court and also petitioned it for a writ of habeas corpus. See Owen v. Crosby, 854 So. 2d 182, 187 (Fla. 2003) ("Owen/Worden III").

The Florida Supreme Court affirmed the denial of Owen's successive 3.850

17

motion and denied his state habeas petition. Id. at 187-88. It determined that Owen's appellate counsel was not ineffective for failing to challenge on direct appeal the admission of Officer McCoy's statement that if Owen were found not guilty, "the hurting will start all over again." Id. at 191. The Florida Supreme Court noted that "appellate counsel could have reasonably concluded that this issue had no merit. In light of the record, Owen's appellate counsel could not have effectively and convincingly argued against the admissibility of the [McCoy] testimony." Id. at 192. It reasoned that McCoy's comment was similar to Owen's statements admitted into evidence, and, when taken in context, did not appear to imply "guilt or future dangerousness." Id. Thus, Owen did not prove deficient performance or prejudice. Id.

The Florida Supreme Court rejected Owen's habeas claim that his appellate counsel should have argued the trial judge was biased and should have recused. Id. Trial counsel's failure to raise a claim of judicial bias procedurally barred it, and, in any event, the claim lacked merit. Id.

The Florida Supreme Court also rejected Owen's argument that his appellate counsel was ineffective for "failing to cite other authority on the issue of the voluntariness of his confession" and on whether the evidence demonstrated sexual battery. Id. at 193 n.15. The Florida Supreme Court stated that it had already

18

addressed the voluntariness and sexual battery/live victim issues on direct appeal and would "not revisit [them] in the guise of ineffective assistance of appellate counsel." Id.

Owen's habeas petition also argued that the Florida Supreme Court erred by not appointing conflict-free counsel for his direct appeal. The Florida Supreme Court rejected this claim as insufficiently pled because Owen failed to identify specific record evidence showing that the alleged conflict of interest compromised his interests. Id. at 194.

## I.    Owen's § 2254 Petition

After the state collateral proceedings, Owen filed a 28 U.S.C. § 2254 petition challenging his convictions and death sentence in the Worden case. The district court denied Owen's claims as either procedurally barred or lacking merit.

## II.  STANDARD OF REVIEW

When examining a district court's denial of a § 2254 petition, we review the district court's factual findings for clear error and its legal determinations de novo. Payne v. Allen, 539 F.3d 1297, 1312 (11th Cir. 2008); McNair v. Campbell, 416 F.3d 1291, 1297 (11th Cir. 2005). Mixed questions of law and fact also merit de novo review. Payne, 539 F.3d at 1312. Furthermore, "[w]e review de novo whether a particular claim is procedurally defaulted." Id.

Owen's § 2254 petition and appeal are governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214, which greatly circumscribes federal court review of state court decisions. Id.; Crowe v. Hall, 490 F.3d 840, 844 (11th Cir. 2007), cert. denied, 128 S. Ct. 2053 (2008). AEDPA "establishes a general framework of substantial deference for reviewing every issue that the state courts have decided." Crowe, 490 F.3d at 844 (quotation marks and citation omitted). In that regard, a federal court shall not grant a writ of habeas corpus on behalf of a state prisoner

> with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). A state prisoner who petitions for a writ of habeas corpus pursuant to § 2254 must have "exhausted the remedies available in the courts of the State" unless "there is an absence of available State corrective process" or "circumstances exist that render such process ineffective to protect [his] rights." Id. § 2254(b)(1). A state court's factual determinations "shall be presumed to be correct," and the petitioner has the burden of rebutting this presumption by clear

and convincing evidence.  Id. § 2254(e)(1).

A state court decision is "contrary to" clearly established federal law when it arrives at an opposite result from the Supreme Court on a question of law, or when it arrives at a different result from the Supreme Court on "materially indistinguishable" facts.  Williams v. Taylor, 529 U.S. 362, 405-06, 120 S. Ct. 1495, 1519-20 (2000).  A state court decision unreasonably applies clearly established federal law when it unreasonably applies the law of the Supreme Court to the facts of a case.  Id. at 408-09, 120 S. Ct. at 1520.  "Clearly established Federal law" means the holdings, not the dicta, of the United States Supreme Court as of the time of the relevant state court decision.  Porter v. Att'y Gen., 552 F.3d 1260, 1267 (11th Cir. 2008).

### III.  DISCUSSION

This appeal involves fourteen claims, which we earlier divided into four categories.  Because nine of the claims were held procedurally barred, we first review the procedural-default principles in federal habeas review.

#### A.    Procedural Bar – General Principles

A § 2254 petitioner "who fails to raise his federal claims properly in state court is procedurally barred from pursuing the same claim[s] in federal court . . . ." Bailey v. Nagle, 172 F.3d 1299, 1302 (11th Cir. 1999).  Such a procedural bar can

21

occur when "the state court correctly applies a procedural default principle of state law to arrive at the conclusion that the petitioner's federal claims are barred" in state court.[9] Id. The state law ground must be "independent of the federal question and adequate to support the judgment." Jennings v. McDonough, 490 F.3d 1230, 1247-48 (11th Cir. 2007), cert. denied, 128 S. Ct. 1762 (2008). To be "adequate," the state rule must be "firmly established and regularly followed." Payne, 539 F.3d at 1313 (quotation marks omitted). If "the last state court rendering a judgment in the case clearly and expressly states" that its judgment denying the petitioner's federal claim rests on a state-law procedural bar, then the federal courts must respect the state court's decision, and the claim is barred from consideration on federal habeas review. Parker v. Sec'y for Dep't of Corr., 331 F.3d 764, 771 (11th Cir. 2003) (quotation marks and citations omitted); see Siebert v. Allen, 455 F.3d 1269, 1271 (11th Cir. 2006). When the last state court rendering judgment does not explain its reasoning, we look through to the last reasoned opinion by a state court on the claim to determine whether the claim is procedurally barred. Ylst v. Nunnemaker, 501 U.S. 797, 803-05, 111 S. Ct. 2590, 2594-96 (1991).

---

[9]A procedural default can also arise when "the petitioner fails to raise the [federal] claim in state court and it is clear from state law that any future attempts at exhaustion would be futile." Zeigler v. Crosby, 345 F.3d 1300, 1304 (11th Cir. 2003) (quotation marks and citation omitted). But that is not the type of procedural bar involved here.

22

There are, however, two ways in which a federal habeas petitioner can overcome a procedural bar. A procedural bar precludes federal review unless the petitioner demonstrates either (1) an adequate cause for and actual prejudice arising from the default, or (2) "that a miscarriage of justice, caused by a substantial denial of constitutional rights, will occur" if the petitioner's federal claims are not considered. Lynd v. Terry, 470 F.3d 1308, 1313-14 (11th Cir. 2006).[10] For purposes of the "cause and prejudice" method of overcoming a procedural bar, a petitioner shows sufficient cause if he can demonstrate "that some 'objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule.'" Siebert, 455 F.3d at 1272 (quoting Murray v. Carrier, 477 U.S. 478, 488, 106 S. Ct. 2639 (1986)). External impediments sufficient to constitute cause "include evidence that could not reasonably have been discovered in time to comply with the rule; interference by state officials that made compliance impossible; and ineffective assistance of counsel at a stage where the petitioner had a right to counsel." Mize, 532 F.3d at 1190. As to the prejudice requirement, the petitioner must show "that there is at least a reasonable probability that the result of the proceeding would have been different had the

_____

[10]Owen does not claim he is actually innocent of the Worden murder. The fundamental miscarriage of justice exception does not apply.

23

constitutional violation not occurred." Id. (quotation marks and citation omitted).

With these principles in mind, we turn to Owen's procedurally barred claims.

**B.   First Category of Procedurally Barred Claims: Waiver of Evidentiary Hearing**

Owen's first category of procedurally barred claims alleges ineffective assistance of trial counsel (1) in Krischer and Kohl having conflicts of interest; (2) in failing to provide Owen's mental health experts with information needed for a proper determination of Owen's competence to stand trial; (3) in failing to develop mental health evidence for an insanity defense during the guilt/innocence phase; (4) in failing to develop mental heath evidence for use as mitigation during the penalty phase; and (5) for not raising certain errors during trial that were ultimately raised in Owen's motion for new trial.[11]  Because the Florida Supreme Court affirmed the denial of these five ineffective-trial-counsel claims on the same procedural-bar ground – Owen's refusal to proceed in good faith at the 3.850 evidentiary hearing – we refer to them collectively as the "3.850 evidentiary

---

[11]Owen's new trial motion alleged that (1) the police testified at the suppression hearing that Owen was arrested on May 30 when he in fact was arrested on May 29, (2) a photo used to identify Owen was taken after he was arrested rather than before, (3) not all of Owen's confessions were videotaped, (4) he was questioned without the presence of counsel, (5) Owen suffered a head injury in 1982, and (6) the police testified that Owen had been dishonorably discharged from the United States army when he in fact had been honorably discharged.  Owen contends his trial counsel were ineffective for not challenging these errors during trial.

hearing claims."

The Florida Supreme Court concluded that the 3.850 court acted within its discretion in denying the 3.850 evidentiary hearing claims because Owen did not make a good faith effort to proceed at the 3.850 evidentiary hearing and thereby waived them. Owen/Worden II, 773 So. 2d at 514-15. The state courts' ruling – that Owen waived the 3.850 evidentiary hearing claims – constitutes an independent and adequate state law ground for denial that procedurally bars the claims from federal habeas review. See Stewart v. Smith, 536 U.S. 856, 858-60, 122 S. Ct. 2578, 2580-81 (2002); Gary v. Hall, 558 F.3d 1229, 1250-53 (11th Cir. 2009).

Owen argues that his procedural default should be excused because he has shown cause and prejudice. Owen contends he was forced to choose between maintaining his attorney-client privilege in the upcoming Slattery retrial or proceeding with his Worden 3.850 evidentiary hearing claims, and this forced choice deprived him of a fair opportunity to raise his Worden claims in the 3.850 court.[12]

_____

[12]Owen analogizes his situation to that in Simmons v. United States, 390 U.S. 377, 394, 88 S. Ct. 967, 976 (1968), in which the Supreme Court held that "when a defendant testifies in support of a motion to suppress evidence on Fourth Amendment grounds, his testimony may not thereafter be admitted against him at trial on the issue of guilt unless he makes no objection" because it is "intolerable that one constitutional right should have to be surrendered in order to assert another."

The flaw in Owen's position is that he never showed a forced choice or an unavoidable conflict between his right to competent counsel in the Worden case and his attorney-client privilege in the Slattery case.[13] For numerous reasons, the record fully supports the 3.850 court's and the Florida Supreme Court's findings that Owen failed to proceed in good faith at the 3.850 evidentiary hearing and thereby waived his 3.850 evidentiary hearing claims.

First, the 3.850 court granted Owen's motion to prohibit disclosure of any information that was privileged with respect to any case other than Worden. Despite having obtained this sought-for relief, Owen refrained from calling the very witnesses who could have presented information on his Worden claims. Four of the five 3.850 evidentiary hearing claims alleged ineffective assistance of counsel during the Worden trial, but Owen never called either of the two trial attorneys in that case – Boudreau and Kohl.

In fact, Owen could have put on at least some substantive evidence to support his claims that did not impinge on his attorney-client privilege in the Slattery case. At a minimum, Owen could have presented testimony as to what

---

[13]For this reason, we express no opinion as to whether, in a properly proven case, a direct, inescapable conflict between maintaining an ineffective assistance of counsel claim in post-conviction proceedings and maintaining attorney-client privilege for an upcoming retrial in a related case will excuse the procedural default arising from waiver of the ineffective assistance claim.

26

Boudreau and Kohl did in investigating and preparing for trial, and why they did what they did. For example, Owen could have readily established what medical, school, and other personal history records they obtained in investigating and presenting Owen's defense. Owen also could have called Kohl to show whether Kohl performed the underlying actions that created the undisclosed conflict of interest Owen alleged. And the scant record created at the 3.850 hearing suggests that Owen may have been able to introduce much more. The record shows that the members of Owen's attorneys' former firm compartmentalized the responsibility for Owen's respective cases.[14] Given that compartmentalization, the firm's eventual dissolution, and Krischer's testimony that (1) he recalled no conversations with Boudreau or Kohl about Owen's cases, and (2) the Slattery and Worden cases "were handled separate and apart from" each other, Owen has not shown Boudreau and Kohl would not have been able to testify about virtually all the facts underlying Owen's 3.850 claims at the evidentiary hearing without implicating the

---

[14]Although Krischer actually used the term "decompartmentalize," it is clear from context that he meant the opposite. For instance, Krischer stated, "[The firm] did decompartmentalize those cases. My responsibility, along with Mr. Salnick, was solely the homicide involving Karen Slattery." Krischer went on to testify that he discussed information about the Slattery case only with Salnick. The members of the firm working on different cases for Owen did not discuss strategy with each other, and their only discussions with each other regarding how the cases would be handled was "[i]n terms of responsibilities for work." Finally, Krischer testifed, "[W]e really did decompartmentalize this effort and the Worden case was handled separate and apart from the Karen Slattery case."

27

attorney-client privilege in the Slattery case.[15]  Moreover, Krischer admitted that he knew virtually nothing about the Worden case except what he learned from newspapers, and that he took pains in dealing with Owen not to discuss Worden.[16] In short, Owen refused to call the witnesses who had knowledge needed to prove his 3.850 evidentiary hearing claims even after testimony established a significant likelihood that their testimony would not implicate his attorney-client privilege in the Slattery case.

Second, Owen neglected to elicit non-privileged information in support of his ineffective assistance claims from the one witness he did call.  Although Krischer had no knowledge of the Worden case, one of Owen's Worden

---

[15]Owen argues that he could not prove his ineffective assistance claims concerning the development of mental health evidence because his Worden post-conviction counsel and his Slattery re-trial counsel employed the same mental health experts and exchanged work product and privileged information. Even assuming such sharing of resources could constitute a sufficient impediment "external to the defense" to represent cause to excuse a procedural default, see Siebert, 455 F.3d at 1272, a dubious proposition given that Owen's conviction in the Slattery case was reversed seven years before Owen filed his Third Amended Rule 3.850 motion, Owen has not demonstrated the requisite prejudice because he has not shown a reasonable probability the result of the proceeding would have been different.

[16]Krischer testified that in preparing for the suppression hearing, he was "pretty careful in telling [Owen] we don't want to hear about [Worden]; we just want to talk about Karen Slattery."  Krischer stated further that "[t]here was no consulting with Mr. Owen with regard to anything he did on the Worden case."
On cross-examination by the State about mental health reports on Owen, Krischer declined to answer, claiming that the sole extent of his responsibility related to the Slattery case. Krischer reiterated, "I had nothing to do with the defense of Mr. Owen with regard to the Worden case."

28

evidentiary hearing claims involved Krischer instead of Owen's trial counsel in the Worden case. Owen claimed that Krischer, who handled the suppression motion, had an undisclosed conflict in the Worden case based on Krischer's service as a former prosecutor, during which he nolle prossed a prior burglary case against Owen. It is difficult to imagine how that created a conflict of interest. But, in any event, when Owen had Krischer on the stand, he never asked Krischer a single question about the facts underlying Krischer's alleged conflict of interest (the State did so on cross-examination).[17]

Third, in a colloquy with the 3.850 court during the evidentiary hearing, Owen's collateral counsel admitted she did not intend to make any attempt to put on substantive evidence:

> THE COURT: Are you planning to pursue [the Krischer conflict of interest] issue . . . ?
> . . .
> MS. IZAKOWITZ: I believe I can't pursue anything based on Mr. Krischer's statement of the attorney/client privilege.
> . . .
> THE COURT: . . . I am prepared to issue an order dismissing your 3.850 if you are telling me you can't proceed. . . . If you are not ready to proceed in regard to this – that's why you called Mr. Krischer as a

---

[17]Krischer testified that he did at some time disclose to Owen the fact that Krischer had worked in the state attorney's office and had nolle prossed a burglary case against Owen in 1982. Krischer testified that Owen never asked him to get off the Worden case because of the conflict, and that at the time he nolle prossed the case, Krischer had no knowledge of Owen on a personal level and did not know of any mental health problems that Owen may have had. If anything, Krischer's testimony showed Owen's undisclosed-conflict claim had no merit.

29

witness.

MS. IZAKOWITZ: I called Mr. Krischer as a witness so that he will put it on the record so that I am not precluded from coming back down the road saying that he is – and presenting a full and fair hearing for Mr. Owen because he is not getting a full and fair trial now. . . . It was my intent to put the trial attorneys on, ask them about the privilege. If they are not waiving the privilege then I see that I cannot go forward because I cannot prove my case.

This statement of intent was consistent with Owen's collateral counsel's actions at the 3.850 evidentiary hearing in basically asking Krischer only about his willingness to reveal privileged information. It is also consistent with Owen's collateral counsel's representation that any other 3.850 witnesses she would call would testify similarly. As the Florida Supreme Court stressed, Owen called Krischer, who served as trial counsel in the Slattery case, and whose testimony therefore "was guaranteed to implicate the privilege." Owen/Worden II, 773 So. 2d at 514.

In sum, Owen refused to avail himself of the opportunity to present at least some evidence at the Worden 3.850 evidentiary hearing. Instead, he took the position, even after obtaining an order from the 3.850 court protecting privileged information, that the mere existence of the attorney-client privilege in the Slattery case absolved him of any need to try and prove anything at the Worden 3.850 hearing. Owen did not present any evidence about the Worden case or show how

30

the Slattery privilege prevented him from presenting any evidence. The state courts' finding of waiver is supported by evidence and constitutes an independent and adequate state procedural ground that precludes federal review.[18] We are left with nothing but speculation and conjecture as to whether cause and prejudice exist.[19] That is not enough to excuse Owen's procedural default.

Thus, Owen's 3.850 evidentiary hearing claims are barred from federal habeas review, and we need go no further. We note, however, that even if these claims were not procedurally barred, they would fail on the merits for lack of evidence. Owen did not present evidence on the claims in state court. Having failed to do so, Owen is not entitled to present evidence in federal court either. Under § 2254(e)(2), if a habeas applicant "has failed to develop the factual basis of

---

[18]The record belies Owen's argument that Owen's waiver of his 3.850 claims was invalid because he did not fully understand the consequences of his decision not to proceed at the evidentiary hearing. The 3.850 court directly addressed Owen at the hearing and informed him that if he did not proceed with the hearing, the court would deny Owen's 3.850 motion and that if the denial was upheld on appeal, "that's the end of the case, 84-4000 [the Worden case], insofar as any appellate rights." Owen answered that he did not understand the legal procedure, but stated, "I understand what the Court has just said." On this basis, the Florida Supreme Court found that "collateral counsel and Owen jointly made the strategic decision to end the evidentiary hearing." Owen/Worden II, 773 So. 2d at 515. This finding is reasonable and amply supported by the record.

[19]Indeed, Owen was re-tried for Slattery's murder in 1999, was convicted, and had his conviction affirmed by the Florida Supreme Court on direct appeal in 2003. The United States Supreme Court denied Owen's certiorari petition in 2004. Yet, despite the passage of five years since Owen's direct appeal from the Slattery retrial concluded, he still has not come forward with any specific evidence in support of his Worden claims that the attorney-client privilege in the Slattery case prevented him from presenting at the 3.850 evidentiary hearing.

31

a claim in State court proceedings, the [federal] court shall not hold an evidentiary hearing on the claim" except in two limited circumstances not present here. 28 U.S.C. § 2254(e)(2). None of Owen's 3.850 evidentiary hearing claims rely on "a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable." Id. § 2254(e)(2)(A)(i). Nor do they rely on "a factual predicate that could not have been previously discovered through the exercise of due diligence." Id. § 2254(e)(2)(A)(ii). Therefore, Owen is not entitled to an evidentiary hearing on those claims in federal court.

## C. Second Category of Procedurally Barred Claims: Insufficiently Pled and Proven Conflict-of-Interest Claim

Owen's second category of claims that the district court denied as procedurally barred alleges his Worden appellate counsel (Boudreau) was ineffective because Boudreau had a conflict of interest as he (1) represented Owen both at trial and on direct appeal, and (2) represented Owen on appeal after Owen filed a bar complaint against him. In denying Owen's state habeas petition, the Florida Supreme Court denied relief on this ineffective-appellate-counsel claim as insufficiently pled because Owen did not identify any specific evidence in the record to support it. Owen/Worden III, 854 So. 2d at 193-94.[20]

---

[20]The Florida Supreme Court stated:
As his final claim, Owen argues that this Court erred by not appointing conflict-free

32

The State claims that the Florida Supreme Court's rejection of Owen's conflict-of-interest claim is a state procedural-bar ruling, as the district court held here, and thus this claim is barred from federal habeas review. We disagree and explain why.

To demonstrate a Sixth Amendment violation based on an attorney conflict of interest, the Supreme Court requires that a defendant "establish that an actual conflict of interest adversely affected his lawyer's performance." Cuyler v. Sullivan, 446 U.S. 335, 350, 100 S. Ct. 1708, 1719 (1980). "[T]he possibility of conflict is insufficient to impugn a criminal conviction." Id. This Court has stated that a conflict-of-interest claimant cannot prevail unless he "can point to specific instances in the record to suggest an actual conflict or impairment of [his]

---

counsel for his direct appeal. To establish a claim premised on an alleged conflict of interest:

> [T]he defendant must "establish that an actual conflict of interest adversely affected his lawyer's performance." A lawyer suffers from an actual conflict of interest when he or she "actively represent[s] conflicting interests." To demonstrate an actual conflict, the defendant must identify specific evidence in the record that suggests that his or her interests were compromised. A possible, speculative or merely hypothetical conflict is "insufficient to impugn a criminal conviction."

Hunter v. State, 817 So. 2d 786, 791-92 (Fla. 2002) (citations omitted). Here, as the State points out, Owen fails to identify specific evidence in the record which shows that his interests were compromised. Owen only states "conflict existed because appellate counsel could not raise his own ineffectiveness and could not raise the fact that Owen had filed a bar complaint"; thus, Owen's claim is insufficiently pled and relief is therefore denied.

Owen/Worden III, 854 So. 2d at 193-94.

33

interests." <u>Smith v. White</u>, 815 F.2d 1401, 1404 (11th Cir. 1987).[21]

The Florida Supreme Court's virtually identical insistence upon specific record evidence showing that appellate counsel's interests were actively compromised constitutes a ruling on the merits of Owen's claim. Thus, Owen's conflict-of-interest claim is not procedurally barred from federal habeas review. And as the Florida Supreme Court held, Owen's claim lacks evidence that his counsel actually represented conflicting interests. <u>See Owen/Worden III</u>, 854 So. 2d at 193-94. Thus, the Florida Supreme Court's denial of Owen's appellate-counsel conflict-of-interest claim was reasonable and consistent with established federal law.[22] <u>See Smith</u>, 815 F.2d at 1404.

---

[21]The <u>Smith</u> Court stated:
> This circuit has adopted a test to distinguish actual from potential conflict: We will not find an actual conflict of interest unless appellants can point to specific instances in the record to suggest an actual conflict or impairment of their interests. Appellants must make a factual showing of inconsistent interests and must demonstrate that the attorney made a choice between possible alternative courses of action, such as eliciting (or failing to elicit) evidence helpful to one client but harmful to the other. If he did not make such a choice, the conflict remained hypothetical.

<u>Id.</u> (brackets and ellipsis omitted).

[22]We reject Owen's argument that the Florida Supreme Court's decision contravenes <u>Holloway v. Arkansas</u>, 435 U.S. 475, 484, 98 S. Ct. 1173, 1178-79 (1978) (finding Sixth Amendment violation where single attorney representing three criminal co-defendants informed the trial court of a "probable risk of a conflict of interest" after each of the defendants decided to testify and court failed either to appoint separate counsel or to investigate the alleged risk of conflict). <u>Holloway</u> involved the specific problem, not present here, of an attorney conflict of interest arising from an ongoing multiple-defendant representation. Furthermore, to the extent Holloway's attorney's motion for appointment of separate counsel lacked factual specificity, the

**D. Third Category of Procedurally Barred Claims: Already Raised and Rejected on Direct Appeal**

In the 3.850 and state habeas proceedings, the Florida Supreme Court also denied Owen's three other ineffective-counsel claims: (1) that trial counsel was ineffective in litigating Owen's suppression motion; (2) that appellate counsel was ineffective in appealing the voluntariness of Owen's confession; and (3) that appellate counsel was ineffective for not appealing the denial of Owen's requested jury charge that sexual battery requires a live victim. The Florida Supreme Court determined that Owen's ineffective-trial-counsel claim as to the suppression motion was procedurally barred because "this claim was raised and rejected on direct appeal." Owen/Worden II, 773 So. 2d at 510. As to the other two claims, the Florida Supreme Court stated, "This Court addressed the voluntariness issue on direct appeal and will not revisit that claim in this habeas petition. We also addressed on direct appeal the sexual battery/live victim issue and will not revisit it in the guise of ineffective assistance of appellate counsel." Owen/Worden III, 854 So. 2d at 193 n.15. Thus, the Florida Supreme Court determined that all three

---

reason was self-evident. As the Supreme Court noted, because of the multiple-defendant representation, the attorney risked violating his duty of confidentiality to his clients by outlining his conflict in more detail. Id. at 485, 98 S. Ct. at 1179. Neither factor is present here. Owen's claim presents a single-defendant representation with no hint of any risk arising from the furnishing of details as to the alleged conflicts of interest and resulting prejudice. The Florida Supreme Court's rejection of Owen's appellate-counsel conflict-of-interest claim is not inconsistent with Holloway.

collateral claims were barred by Florida law, which prohibits claims that were rejected on the merits on direct appeal from being re-litigated on collateral review in the form of ineffective assistance of counsel.  See Franqui v. State, 965 So. 2d 22, 33 (Fla. 2007), cert. denied, 128 S. Ct. 2443 (2008); Harvey v. Dugger, 656 So. 2d 1253, 1256 (Fla. 1995).

Based on the state court's ruling, the district court held these claims were procedurally barred from federal habeas review.  But that is wrong too.  The United States Supreme Court recently has made clear that when a state court denies collateral review on the ground that the claim was already decided on direct appeal, that state ruling does not bar federal review:

> When a state court declines to review the merits of a petitioner's claim on the ground that it has done so already, it creates no bar to federal habeas review. . . . When a state court refuses to readjudicate a claim on the ground that it has been previously determined, the court's decision does not indicate that the claim has been procedurally defaulted.  To the contrary, it provides strong evidence that the claim has already been given full consideration by the state courts and thus is ripe for federal adjudication.
> A claim is procedurally barred when it has not been fairly presented to the state courts for their initial consideration – not when the claim has been presented more than once.

Cone v. Bell, 556 U.S. –, – S. Ct. –, 2009 WL 1118709, at *10-11 (Apr. 28, 2009) (citation omitted); accord LeCroy v. Sec'y, Fla. Dep't of Corr., 421 F.3d 1237, 1260 (11th Cir. 2005) (discussing claim held procedurally barred on state collateral

review because "it either was or could have been raised on direct appeal," and stating that if claim "was raised on direct appeal in state court, it was necessarily ruled upon and might very well be foreclosed from state collateral attack, but it would be available in the federal case as an exhausted claim" (quotation marks and brackets omitted)); Smith v. Dugger, 840 F.2d 787, 791 (11th Cir. 1988) (same).[23]

In sum, Owen's claims of ineffective trial and appellate counsel as to his confession, and ineffective appellate counsel as to the sexual-battery jury charge, are not barred from federal habeas review. Moreover, as shown below, the underlying substantive claims on those issues lack merit.[24] Thus, any deficiencies of counsel in failing to raise or adequately pursue them cannot constitute ineffective assistance of counsel.[25] See Shere v. Sec'y, Fla. Dep't of Corr., 537

---

[23]We have recently muddied the waters in this area. See Wellons v. Hall, 554 F.3d 923, 936 & n.6 (11th Cir. 2009) (concluding that claim raised and rejected on merits on direct appeal, then re-raised in state habeas and rejected there on res judicata grounds, was procedurally barred from federal habeas review). Wellons's conclusion as to procedural bar conflicts with our earlier precedent in LeCroy and Smith, though, and does not bind us. See United States v. Ohayon, 483 F.3d 1281, 1289 (11th Cir. 2007) ("When a decision of this Court conflicts with an earlier decision that has not been overturned en banc, we are bound by the earlier decision."). In any event, the Supreme Court's pronouncement in Cone overrules that part of the Wellons decision.

[24]As to sexual battery, Owen's counsel did not appeal the trial court's refusal to charge the jury that it had to find beyond a reasonable doubt that Worden was alive at the time of sexual penetration (that failure forms the basis for Owen's ineffective assistance claim), but Owen's appellate counsel did make the related argument that the sexual battery conviction should be reversed because the evidence did not show Worden was alive. We consider the interrelation of the two arguments below when we discuss Owen's substantive sexual-battery claim.

[25]We review Owen's ineffective assistance of counsel claims under the two-prong test in Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052 (1984). To show ineffective assistance

37

F.3d 1304, 1311 (11th Cir. 2008) (agreeing that "appellate counsel is not ineffective for failing to raise a meritless issue on appeal"); Ladd v. Jones, 864 F.2d 108, 110 (11th Cir. 1989) ("[S]ince these claims were meritless, it was clearly not ineffective for counsel not to pursue them.").

## E.     Five Claims Considered on the Merits

### 1.     Denial of Motion to Suppress

Owen claims the trial court violated his Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendment rights by denying his motion to suppress his confession. Owen argues the court should have suppressed his confession because (1) the police detained and later arrested him without reasonable suspicion; (2) the police interrogation was psychologically coercive; (3) Owen invoked his right to remain silent; and (4) the State failed to provide him with counsel during the interrogation.

On direct appeal, the Florida Supreme Court rejected the first three arguments as follows:

> Owen's next claim, that police lacked sufficient grounds for stopping and arresting him, is without merit. He was stopped and arrested based on outstanding warrants and photographic identifications made by two burglary victims. Owen's assertion that his statements to police were obtained through psychological coercion has already been

under Strickland, Owen must show (1) "that counsel's representation fell below an objective standard of reasonableness"; and (2) "that the deficient performance prejudiced the defense." Id. at 687-88, 104 S. Ct. at 2064.

rejected by this Court.[26] His claim that his confession was obtained in violation of the rules established in <u>Miranda v. Arizona</u>, 384 U.S. 436, 86 S. Ct. 1602, 16 L.Ed.2d 694 (1966), is without merit. He was routinely informed of his rights and voluntarily waived them.

<u>Owen/Worden I</u>, 596 So. 2d at 987 (citations omitted). As to Owen's right-to-counsel argument, the Florida Supreme Court pointed out that Owen had received counsel the day after his arrest only on his burglary charges, not for the Worden case. <u>Id.</u> The Florida Supreme Court then noted that the right to counsel attaches when "judicial criminal proceedings" commence, and "is offense-specific." <u>Id.</u> at 987-89. Thus, the Florida Supreme Court reasoned that the attachment of Owen's right to counsel on the burglary charge and warrants did not invalidate his questioning on the unrelated Worden and Slattery murders:

> In the present case, although Owen's right to counsel had attached and been invoked on the initial burglary charge and outstanding warrants by the time of his first appearance on those offenses, this fact is

---

[26]Here, the Florida Supreme Court cited its discussion of the psychological coercion issue in <u>Owen/Slattery I</u>, where it stated:

> Owen's more serious argument is that he was psychologically coerced into confessing by extended interrogation sessions, feigned empathy, flattery, and lengthy discourse by the police. These interrogations sessions were videotaped and we have, as [had] the trial judge, the benefit of actually viewing and hearing them. It is clear from these tapes that the sessions were initiated by Owen, who was repeatedly advised of his rights to counsel and to remain silent. Moreover, he acknowledged on the tapes that he was completely familiar with his <u>Miranda</u> rights and knew them as well as the police officers. It is also clear that the sessions, which encompassed six days, were not individually lengthy and that Owen was given refreshments, food, and breaks during the sessions. The tapes show that the confession was entirely voluntary under the fifth amendment and that no improper coercion was employed.

<u>Owen/Slattery I</u>, 560 So. 2d at 210.

39

unrelated to his rights concerning the Worden murder. His rights on the murder charge attached when he attended first appearance on that offense. Because the questioning session during which he confessed took place prior to this first appearance, Owen had no Sixth Amendment right to counsel at that time. Thus, no Sixth Amendment right was violated.

Id.

Owen has not shown that the Florida Supreme Court's adjudication of his suppression claims "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the Untied States," or that it "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

With respect to reasonable suspicion, the evidence amply supports the state court's findings that Owen was identified in a photographic lineup by two burglary victims and was stopped and arrested based on those identifications and multiple outstanding warrants for failure to appear.[27] Moreover, the Florida Supreme

---

[27]At the suppression hearing, Sergeant John Brady of the Boca Raton Police Department testified that on May 29, 1984, two individuals independently picked Owen out of photographic lineups as the man who burglarized, or attempted to burglarize, their homes. Once Owen was identified in the photographic lineups, Boca Raton police officers began looking for Owen. Brady also testified that there were outstanding failure-to-appear warrants for Owen's arrest.

Kathleen Petracco, the officer who arrested Owen, testified that on the morning of May 30, 1984, Officer McCoy gave her Owen's picture and physical description and told her Owen was being sought on outstanding warrants and as a suspect in two burglaries. Petracco went to look for Owen, and that afternoon she spotted a man who fit Owen's description walking beside

40

Court's conclusion that Owen was detained on reasonable suspicion and arrested based on probable cause is consistent with clearly established federal law. See, e.g., Hiibel v. Sixth Jud. Dist. Ct. of Nev., 542 U.S. 177, 186, 124 S. Ct. 2451, 2458 (2004); Maryland v. Pringle, 540 U.S. 366, 370-72, 124 S. Ct. 795, 799-801 (2003).

With respect to psychological coercion and the right to remain silent, Owen has failed to show that the Florida Supreme Court's findings – that his confession was freely and voluntarily given – were unreasonable or contrary to federal law. The record demonstrates that Owen was repeatedly informed of his rights and repeatedly waived them, that the interrogating officers told him they could make no binding promises, and that Owen himself initiated discussions with the officers on certain occasions.[28] In fact, the record suggests that Owen saw the questioning as a game between the officers and himself, in which Owen would tease the

a city street. Petracco radioed for McCoy to come, then stopped the man, asked him for his name and identification, and compared him to the picture. Petracco said the man she stopped "looked identical" to the man in the picture. Petracco and McCoy arrested the man, who was Owen (though he gave the officers false identification and a fake name), and took him into custody based on (1) the similarity between his appearance and the photograph of Owen, and (2) his statement that he used to live on Coventry Street, where McCoy knew Owen used to live.

[28]We reject Owen's argument that his counsel was ineffective for not citing Blackburn v. Alabama, 361 U.S. 199, 80 S. Ct. 274 (1960). In Blackburn, the Supreme Court concluded that a robbery suspect's confession was involuntary, under the totality of the circumstances, where, among other things, the medical evidence "indisputably establishe[d] the strongest possibility that [the suspect] was insane and incompetent at the time he allegedly confessed." Id. at 206-08, 80 S. Ct. at 279-81. Blackburn is clearly distinguishable.

officers with a few details, but withhold his confession until the police demonstrated they could prove each charge against him.[29]

Finally, the Florida Supreme Court's determination that Owen's right to counsel did not attach in the Worden case until after he confessed is consistent with, and a reasonable application of, federal law. See McNeil v. Wisconsin, 501 U.S. 171, 175, 111 S. Ct. 2204, 2207 (1991) (stating that the Sixth Amendment right to counsel is "offense-specific" and does not attach for a particular offense "until a prosecution is commenced, that is, at or after the initiation of adversary judicial criminal proceedings – whether by way of formal charge, preliminary hearing, indictment, information, or arraignment" (quotation marks omitted)).

Owen admits that no charges had been filed against him regarding Worden's murder at the time he was questioned about, and confessed to, killing Worden. Nevertheless, Owen contends that his right to counsel had attached with respect to the Worden case because the day after his arrest (three weeks before his June 21

---

[29]For instance, on several occasions Owen recited poems to the interrogating officers that either suggested his complicity in the murders or set forth the rules of the "game" he had established with the officers. During his questioning on June 18, 1984, Owen stated, "Roses are red, Pigs are blue, Start counting victims, There will be quite a few." On June 21, 1984, when the officers referred to this poem and asked Owen how many "victims [were] out there," Owen recited another poem, "Roses are red, yellow, white and pink; to play my game, you have to think." Later that day, after Owen confessed to the Worden murder, he was asked, "Is that what it took to get you to tell them about it is to have them prove that you were had?" Owen replied, "Once I see it on paper, you know."

42

confession), Owen appeared in court to answer for the unrelated burglary charges and warrants on which he was arrested and the court set a $100,000 bond on the representation of an FBI agent that Owen was a suspect in the Worden and Slattery murder cases.

Owen's contention is groundless. In McNeil, the Supreme Court noted that the purpose of the Sixth Amendment right to counsel "is to protect the unaided layman at critical confrontations with his expert adversary, the government, after the adverse positions of government and defendant have solidified with respect to a particular alleged crime." Id. at 177-78, 111 S. Ct. at 2208-09 (quotation marks omitted). The Florida Supreme Court reasonably applied this federal precedent in concluding that Owen's right to counsel had not attached with respect to the Worden murder simply because Owen had a right to counsel in his unrelated burglary cases and was a suspect in the Worden and Slattery murders.

2.      Sufficiency of Evidence to Support Sexual Battery Conviction

Owen claims there was no substantial evidence to support his sexual battery conviction because the evidence uniformly demonstrated that Worden was not alive at the time of sexual penetration. See Jones v. State, 569 So. 2d 1234, 1237 (Fla. 1990) ("[A] victim of sexual battery must have been alive at the time of the assault to support the elements of this crime."). The Florida Supreme Court

disagreed, stating that "[w]hether the victim was alive or dead at the time of sexual union . . . is an issue of fact to be determined by the jury," and finding that "[c]ompetent substantial evidence supports [the jury's] finding [that Worden was alive]." Owen/Worden I, 596 So. 2d at 987.

Owen has not demonstrated an entitlement to relief on this claim either. The "critical inquiry" for § 2254 challenges to the sufficiency of the evidence supporting a state conviction "is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 318-19, 99 S. Ct. 2781, 2788-89 (1979). Owen has not shown that the Florida Supreme Court's analysis was contrary to, or an unreasonable application of, Jackson.

At trial, the jury heard testimony from Palm Beach County Medical Examiner Dr. James Benz, who autopsied Worden's body. Semen was found in Worden's vagina, indicating sexual intercourse occurred. Dr. Benz testified that Worden suffered injuries to three parts of her body: (1) she received five blows to her head from a blunt object, such as a hammer; (2) she suffered compression injuries to her neck consistent with being strangled by someone's glove- or sock-covered hands; and (3) her vagina had two several-inch-long lacerations consistent

44

with penetration by a blunt object such as the handle of a hammer.

According to Dr. Benz, the physical evidence suggested Worden received the head injuries first. Although the blows to the head caused Worden's death, Dr. Benz stated that they were not immediately fatal, as Worden lived long enough afterward to breathe blood into her lungs and to suffer heart failure.[30] Dr. Benz refused to testify that Worden was dead when she received the vaginal injuries, and stated that (1) a small amount of hemorrhaging was present at the site of the vaginal lacerations, and (2) bleeding could not occur after death.

Moreover, in Owen's videotaped confession, which was played for the jury, Owen said that he went to Worden's house to rape her, and he did. Although his original plan was to awaken Worden and gain her silence by telling her other men were holding her children hostage, he opted instead to beat her unconscious with the hammer before he raped her.[31] Owen did not say when he inflicted the injuries

---

[30]Dr. Benz testified:

Q      All right, sir, now, as a result of your autopsy, would you indicate, Doctor, whether the evidence reflected that Georgianna Worden was alive during all of the five distinct blows?

A      Yes. This person did not die immediately. That was readily evident by the fact that there was a time lapse where she went into heart failure. She had accumulated fluid in the lungs. She ha[d] aspirated blood into her lungs, which shows that she was alive for a while after these blows were inflicted.

[31]Owen stated:
I just figured I'd just go up there and rape her, you know, and I went over by her so I figured, hell, once she gets up, you know, I was going to say, just tap her on the

45

to Worden's neck and vagina.

From the above testimony, a rational jury could have concluded beyond a reasonable doubt that Owen was guilty of sexual battery under Florida law. The Florida Supreme Court's conclusion that competent substantial evidence supported a determination that Worden was alive at the time of the sexual penetration was reasonable and consistent with established federal law.

Furthermore, Owen's related claim of ineffective counsel for failure to appeal the trial court's denial of Owen's requested sexual battery charge fails on the merits. Owen argues he was prejudiced because the trial court did not expressly charge the jury that it was required to find beyond a reasonable doubt that Worden was alive at the time of sexual penetration. The trial court charged the jury:

> [B]efore you can find the Defendant guilty of sexual battery, the State must prove the following four elements beyond a reasonable doubt: One, Georgian[n]a Worden was over the age of eleven years; Two, Duane Owen, with his sexual organ or with a blunt instrument, or both, penetrated the vagina of Georgian[n]a Worden; Three, Duane Owen, in the process, used or threatened to use, a deadly weapon, or used actual, physical force likely to cause serious personal injury;

---

shoulder, and say, there's other guys in the other room that got your daughter, or something; that way she wouldn't scream.
Instead, I figured, well, hell, maybe I'll just hit her once, and then that way she'll get knocked out. So I did.
Worden screamed and tried to rise after Owen hit her the first time, so he hit her several more times to knock her unconscious.

46

Four, the act was done without the consent of Georgian[n]a Worden. A weapon is a deadly weapon if it is used or threatened to be used in a way likely to produce death or great bodily harm.

The charge, as a whole, contemplates Worden was alive, in that it requires the State to prove Worden was over eleven years old and did not give consent, two factors that have little meaning except where the victim is a living human being.

In any event, Owen has not shown the jury's decision likely would have been different with the requested charge. See Porter v. Att'y Gen., 552 F.3d 1260, 1269 (11th Cir. 2008) ("In assessing prejudice, the reviewing court . . . [asks] if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors."). Substantial competent evidence supports the sexual battery conviction. Further, the sexual battery conviction was not needed to support any of the aggravating factors found to exist in the penalty phase.[32] Owen has not carried his burden to establish prejudice from

---

[32]The state trial judge found four statutory aggravating factors: (1) Owen was previously convicted of another capital felony or violent felony; (2) Owen murdered Worden while committing or attempting to commit a burglary or sexual battery; (3) the murder was especially heinous, atrocious, or cruel; and (4) the murder was committed in a cold, calculated, and premeditated manner. The Worden sexual battery was irrelevant to the first factor. As to the second factor, the state trial judge acknowledged Owen's argument that Worden was dead at the time of sexual penetration, and stated that although there was sufficient evidence that Worden was alive, Owen's conduct would still constitute attempt and thereby establish the factor. We note that the burglary, which Owen does not challenge, establishes the second factor as well. As to the other two aggravating factors, even if Worden had died before Owen managed to accomplish the sexual battery, this fact would not negate the cruel and heinous nature or cold and calculated manner of Owen's crime.

his appellate counsel's failure to raise the sexual-battery-charge issue. Thus, his

claim fails.

3.      Brady Violation

Owen claims the State committed a Brady violation by withholding from

defense counsel a copy of the handwritten notes of mental health therapist Linda

Burkholder.[33] Owen alleges that in 1983, pursuant to a Michigan court order, he

underwent several months of therapy with Burkholder. During the therapy

sessions, Burkholder made notes on a steno pad. When Owen was arrested in Boca

Raton in May 1984, Owen allegedly told McCoy about the sessions, and McCoy

allegedly told Owen that the FBI had possession of Burkholder's notes at the time

and that McCoy had made arrangements to get the therapy records from the FBI.

During discovery in the Worden case, the State provided Owen only with the

admission sheets from the Burkholder therapy sessions, not the steno notes.

Owen raised the Brady claim in his pro se Rule 3.850 motion. The 3.850

---

[33]Pursuant to Brady, a State may not suppress evidence "favorable to an accused . . .
where the evidence is material either to guilt or to punishment, irrespective of the good faith or
bad faith of the prosecution." Strickler v. Greene, 527 U.S. 263, 280, 119 S. Ct. 1936, 1948
(1999) (quoting Brady, 373 U.S. at 87, 83 S. Ct. at 1196-97). Evidence is considered "material"
for Brady purposes "if there is a reasonable probability that, had the evidence been disclosed to
the defense, the result of the proceeding would have been different." Id. (quotation marks and
citation omitted). The duty extends to impeachment evidence as well as exculpatory evidence.
Id. To establish a Brady violation, a defendant must show that the government possessed the
information and that the defendant did not possess it and could not, through reasonable
diligence, have obtained it. Davis v. Terry, 465 F.3d 1249, 1254 (11th Cir. 2006).

court denied the claim, and the Florida Supreme Court affirmed. Owen/Worden III, 854 So. 2d at 187-88. Specifically, the Florida Supreme Court found the claim to be insufficiently pled because Owen did not allege (1) when he obtained the allegedly withheld information, or (2) that the State possessed the material. Id.

Owen is not entitled to relief on this claim because the Florida Supreme Court reasonably concluded that Owen failed to establish that the State possessed Burkholder's notes. Owen alleged only that the FBI had Burkholder's notes and the State did not produce them; he never demonstrated that the State had the notes, or that the State and the FBI had sufficiently pooled their resources such that the information in the FBI's possession could be imputed to the State. See United States v. Antone, 603 F.2d 566, 569-71 (5th Cir. 1979) (concluding that where federal and state authorities cooperate sufficiently extensively in investigating and prosecuting a defendant, the knowledge of one group can be imputed to the other because the state and federal agents were "in a real sense members of the [same] prosecutorial team").[34] Indeed, we have unearthed nothing in the record that suggests either that the FBI had substantial involvement in the Worden case, or that

_____

[34]Fifth Circuit decisions issued before October 1, 1981 are binding precedent in this Court. Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

49

the State ever had access to, or knowledge of, Burkholder's steno notes.[35]

4.      Admission of Prejudicial Statement

Owen's next claim asserts ineffective appellate counsel for not appealing the admission of an allegedly prejudicial statement made by Officer McCoy during the Worden trial.  During McCoy's testimony about Owen's interrogation, the State asked McCoy whether Owen ever revealed if he intended to go to trial for the Worden murder, and McCoy gave an extended narrative response:

> Q      . . . [D]id there come a point in time when Mr. Owen indicated his intent as to what he would do in relation to proceeding to trial?
>
> A      Yes.  He – after this line of conversation he said to me, "Well, I am going to go to trial, anyway," he says, "and fight this, because I have nothing to lose by going to trial."
> So following this up, I asked him, "What do you think the verdict will be?"
> To which Mr. Owen replied, "Guilty."
> . . .
> I went one step further and I asked him, I says, "Well, suppose you were found not guilty."  I says, "Who would be the winner then?"
> Mr. Owen said, "No one would be the winner."
> And I said, "Then the hurting will start all over again."
> And Mr. Owen was nodding his head in the affirmative.

---

[35]Because the Florida Supreme Court found Owen's <u>Brady</u> claim was insufficiently pled, it did not reach the materiality issue.  Neither Owen nor the State seem able to articulate precisely what information the Burkholder notes contain.  However, because Owen cannot demonstrate that the Florida Supreme Court misapplied federal law or made an unreasonable factual finding as to the State-possession element, we need not discuss whether the Burkholder notes constitute material evidence or, further, whether they were obtainable by Owen through reasonable diligence.

Worden counsel Boudreau moved to strike McCoy's statement and for a mistrial. Boudreau argued that McCoy's "hurting will start all over again" comment was prejudicial because it implied "a propensity to commit crimes and kill people." The trial court denied the motions.

On direct appeal, Boudreau did not challenge the trial court's denial of the motions arising from McCoy's statement. In his state habeas petition, Owen alleged that Boudreau's failure to raise the issue was ineffective assistance of appellate counsel. Denying the habeas claim, the Florida Supreme Court concluded that (1) Owen's appellate counsel "could not have effectively and convincingly argued against the admissibility of" McCoy's statement; (2) McCoy's statement did not imply guilt or future dangerousness, as Boudreau argued at trial; and (3) "in fact, McCoy never referred to Owen hurting or continuing to hurt other people." Owen/Worden III, 854 So. 2d at 191-92. Thus, Boudreau's failure to raise the issue on appeal was not deficient performance. Id. Further, Owen has not shown prejudice from the failure to raise the claim because the jury heard Owen make similar statements when it viewed Owen's videotaped confession.

Owen contends the Florida Supreme Court unreasonably applied the Strickland test and that its decision rested on factual findings that were unreasonable in light of the evidence. We disagree. When considered in context

51

with the other discussions that occurred during Owen's interrogation, McCoy's vague statement about "the hurting" starting all over again if Owen were acquitted could be reasonably interpreted to refer to emotional harm that Owen himself would suffer unless he confessed and accepted responsibility.[36] Thus, we cannot say that the Florida Supreme Court unreasonably concluded that Owen's appellate counsel's decision not to appeal the admission of McCoy's statement fell within the wide range of professionally competent assistance. Moreover, other statements by Owen in his confession were similar to McCoy's "hurting" statement. Thus, the Florida Supreme Court's conclusion that there was no reasonable likelihood that Owen's convictions or sentence would have been different absent the failure to appeal the admission of McCoy's statement was also a reasonable application of federal law.

5.      Trial Court Bias

In his final claim, Owen contends his appellate counsel was ineffective for not appealing the trial judge's alleged bias. Owen's judicial bias allegations arise from a series of questions the trial judge posed at the suppression hearing.

---

[36]For instance, during the interrogation McCoy told Owen, "The confession part helps Duane because he's got to get it off him. . . . [I]t's going to help you, man. I know. . . . I see the hurt in your eyes. . . . That is why I can tell you, yeah, that's going to make you feel better." McCoy also told Owen, "I can see the hurt, okay. . . . I'm trying to tell you, okay, to help yourself. To get it out. Get it off. Get rid of it. Get rid of it. Before it eats you up, man, because it's doing a hell of a number on you right now."

Owen's suppression motion was an omnibus motion covering ten criminal cases then pending against Owen, including the Worden and Slattery cases. At the hearing, the trial judge asked the state attorney, with respect to each individual case covered by the suppression motion, whether "granting the Motion to Suppress [would] prevent the State from going forward with regard to that case at this time." The trial judge stated that whether the State would proceed would "not be a consideration with regard to the resolution" of the suppression motion.[37]

Owen's trial attorneys did not object to the trial judge's questions. Nor did his appellate counsel challenge the trial judge's impartiality based on the questions. In Owen's state habeas petition, he claimed his appellate counsel was ineffective for not raising the issue. The Florida Supreme Court rejected this claim, concluding that "the trial judge made no statements which would cause Owen to believe that he would not receive a fair trial," and the judge's comments were insufficient to show Owen was denied his right to an unbiased tribunal. Owen/Worden III, 854 So. 2d at 192.

The Florida Supreme Court's finding was reasonable. First, the trial judge expressly stated that the effect of the motion on the various cases against Owen

---

[37]As to the Worden case, the state attorney responded that granting the motion to suppress would "[p]robably not" prevent the State from going to trial.

would "not be a consideration with regard to the resolution" of the suppression motion. Second, the questions themselves did not show bias or demonstrate, as Owen argues, that the trial judge's consideration of the merits of Owen's suppression motion was impacted by the motion's potential effect on the cases against Owen.[38] The trial judge did not give a reason for the questions; the only thing he said definitively was that his consideration of the merits of the suppression motion would <u>not</u> be affected by a concern for his ruling's effect on the cases' prosecution. In light of this express statement, and the ambiguous nature of the questions themselves, we conclude that Owen has failed to show that the Florida Supreme Court's finding of no demonstrated bias was unreasonable.

## IV. CONCLUSION

For the reasons set forth above, we affirm the district court's denial of Owen's § 2254 petition.

**AFFIRMED.**

---

[38]The questions could have stemmed, for example, from a desire to have early information to guide the trial court in scheduling or administration of the ten cases in which the motion had been filed.